# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

KURT FOX, on behalf of himself and all others similarly situated,

Plaintiff,

v.

CDX HOLDINGS, INC. (F/K/A CARIS LIFE SCIENCES, INC.),

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 8031-VCL

## MEMORANDUM OPINION

Date Submitted: May 5, 2015
Date Decided: July 28, 2015

Richard H. Cross, Jr., Christopher P. Simon, David G. Holmes, CROSS & SIMON, LLC, Wilmington, Delaware; Daniel S. Cahill, Louis Gambino, CAHILL GAMBINO LLP, Saratoga Springs, New York; *Attorneys for Plaintiff Kurt Fox and the Class.*

Gregory P. Williams, Thomas A. Beck, Brock E. Czeschin, Susan M. Hannigan, Rachel E. Horn, Matthew D. Perri, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; *Attorneys for Defendant CDx Holdings, Inc.*

**LASTER, Vice Chancellor.**

Caris Life Sciences, Inc. ("Caris" or the "Company") was a privately held Delaware corporation. Through subsidiaries, it operated three business units: Caris Diagnostics, TargetNow, and Carisome.[1] Caris Diagnostics was consistently profitable. TargetNow generated revenue but not profits. Carisome was in the developmental stage.

To achieve the dual goals of securing financing for TargetNow and Carisome and generating a return for its stockholders, Caris sold Caris Diagnostics to Miraca Holdings, Inc. ("Miraca"). To minimize taxes, the transaction was structured using a spin/merge structure (the "Miraca Transaction"). Caris first transferred ownership of TargetNow and Carisome to a new subsidiary, then spun off that subsidiary to its stockholders (the "Spinoff"). At that point, owning only Caris Diagnostics, Caris merged with a wholly owned subsidiary of Miraca (the "Merger").[2]

---

[1] TargetNow sometimes appeared in the record with an intervening space as "Target Now," and Carisome sometimes appeared in the plural as "Carisomes." This decision has chosen to omit the space and use the singular. If a quotation from an underlying document uses the alternative form, this decision has modified the quotation without bracketing the change.

[2] The actual Miraca Transaction was more complex, and keeping track of the various entities is more difficult. For example, Caris owned TargetNow through a direct subsidiary called Caris Molecular Diagnostics, Inc. ("CMD") and an indirect subsidiary called Caris MPI, Inc. Caris owned Carisome through a direct subsidiary called Caris Life Sciences (Gibraltar) Limited ("GibCo") and an indirect subsidiary called Caris Life Sciences Luxembourg Holdings. To carry out the Spinoff, Caris transferred CMD to GibCo, next transferred ownership of GibCo to a newly created Cayman Islands entity, then spun off the Cayman Island entity. After the Merger, the Cayman Islands entity changed its name to Caris Life Sciences. Before the Merger, CDx Holdings, Inc. was the name of the direct subsidiary through which Caris owned the Caris Diagnostics business. Through the Merger, Caris changed its name to CDx, and the direct subsidiary became

1

David Halbert, the founder of Caris, owned 70.4% of its fully diluted equity. JH Whitney VI, L.P. ("Fund VI"), a private equity fund, owned another 26.7%. They received a proportionate equity stake in the spun-off entity ("SpinCo"), which kept them whole for purposes of their pre-transaction beneficial ownership of TargetNow and Carisome. In the Merger, Miraca paid $725 million for what was left of Caris ("RemainCo"). Each share of RemainCo stock was converted into the right to receive $4.46 in cash. Halbert and Fund VI received their share of the cash, representing the value of their pre-transaction beneficial interest Caris Diagnostics.[3] Through the Miraca Transaction, Halbert and Fund VI received total proceeds of approximately $560 million. They financed SpinCo by reinvesting $100 million.

Most of the remaining approximately 2.9% of Caris's fully diluted equity took the form of stock options that were cancelled in connection with the Merger. Under the terms of the 2007 Stock Incentive Plan (the "Plan"), each holder was entitled to receive for each share covered by an option the amount by which the "Fair Market Value" of the share exceeded the exercise price. The Plan defined Fair Market Value as an amount determined by the Caris board of directors (the "Board"). The Plan required the Board to

---

something else. The named defendant in this case, CDx, is the same entity that this decision refers to as Caris.

[3] This too is an oversimplification. Halbert and Fund VI held most of their equity in the form of preferred stock. In the Merger, they received the liquidation preference or other payment contemplated by the preferred stock in addition to $4.46 per share for their common stock.

adjust the options to account for the Spinoff. Under the terms of the Plan, the Board's good faith determinations were conclusive unless arbitrary and capricious.

Caris told the option holders that they would receive the difference between $5.07 per share and the exercise price of their options, minus 8% that would go to an escrow account contemplated by the merger agreement. Of the $5.07, $4.46 was for RemainCo; the remaining $0.61 was for SpinCo. Caris represented in discovery that it used this methodology, and the pre-trial order contained stipulations to that effect. During post-trial argument, Caris revealed that it engaged in a very different calculation. It claims the different method generated the same result.

The plaintiff, Kurt Fox, sued on behalf of a class of option holders. He contends that Caris breached the Plan because members of management, rather than the Board, determined how much the option holders would receive. He also contends that regardless of who made the determination, the $0.61 per share attributed to SpinCo was not a good faith determination and resulted from an arbitrary and capricious process. He lastly contends that the Plan did not permit Caris to withhold a portion of the option consideration as part of the escrow holdback contemplated by the merger agreement.

The evidence at trial established that the Board did not make the determinations it was supposed to make. Gerard A. Martino, the Executive Vice President, Chief Financial Officer, and Chief Operating Officer, made the determinations, then received perfunctory signoff from Halbert. The evidence at trial further established that the number Martino picked for SpinCo was not a good faith determination of Fair Market Value. It was the figure generated by PricewaterhouseCoopers ("PwC"), the Company's tax advisor, using

3

an intercompany tax transfer analysis that was designed to ensure that the Spinoff would result in zero corporate level tax. Martino told PwC where to come out, and he supplied PwC with reduced projections to support the valuation he wanted. PwC's conclusion that SpinCo had a value of $65 million conflicted with Martino's subjective belief from earlier in the year that TargetNow alone was worth between $150 and $300 million. It likewise conflicted with the views held by Halbert, Fund VI, and the Company's financial advisor. It contrasted with higher values that a different accounting firm, Grant Thornton LLP, generated for the same businesses in a series of valuation reports prepared during 2011.

Miraca questioned PwC's valuation and insisted on a second opinion from Grant Thornton. Martino and PwC met with Grant Thornton before the firm started work. Two days later, Martino sent an email to Halbert that precisely anticipated the range of consideration per share that the two reports would support. Grant Thornton then proceeded to prepare a valuation that largely—and admittedly!—copied PwC's analysis. Grant Thornton's answer came in just below PwC's. The valuation was not determined in good faith, and the process was arbitrary and capricious.

Finally, the plain language of the Plan did not permit Caris to withhold a portion of the option consideration in escrow. The merger agreement was not the contract that governed the relationship between the option holders and Caris. The Plan was.

Caris breached the Plan. The class is entitled to damages of $16,260,332.77, plus pre- and post- judgment interest at the legal rate, compounded quarterly, from November 22, 2011 until the date of payment.

4

## I. FACTUAL BACKGROUND

Trial took place from December 3-5, 2014. The plaintiff bore the burden of proving his contentions by a preponderance of the evidence.[4] The parties introduced 217 exhibits, lodged depositions for nine witnesses, and presented live testimony from five fact witnesses and one expert. After trial, Caris was permitted to supplement the record with two additional exhibits.

The central fact issue was what Halbert, Martino, and other Caris principals believed in fall 2011 about the value of TargetNow and Carisome. Extensive contemporaneous evidence established that principals believed the businesses had value exceeding the $65 million that Martino assigned them for the Miraca Transaction.

At trial, the defense witnesses testified differently. Except for Martino and Halbert, the defense witnesses seemed honestly to believe when testifying that they thought TargetNow and Carisome had very little value in fall 2011. In my view, this was

---

[4] *See Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010); *United Rentals, Inc. v. RAM Hldgs., Inc.*, 937 A.2d 810, 834 n.112 (Del. Ch. 2007) ("The burden of persuasion with respect to the existence of the contractual right is a 'preponderance of the evidence' standard."). "Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not." *Agilent Techs, Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (Strine, V.C.) (internal quotation marks omitted). "Under this standard, [the plaintiff] is not required to prove its claims by clear and convincing evidence or to exacting certainty. Rather, [the plaintiff] must prove only that it is more likely than not that it is entitled to relief." *Triton Constr. Co. v. E. Shore Elec. Servs.*, 2009 WL 1387115, at *6 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

a product of of hindsight bias. "Hindsight bias has been defined in the psychological literature as the tendency for people with outcome knowledge to believe falsely that they would have predicted the reported outcome of an event." Hal R. Arkes & Cindy A. Schipani, *Medical Malpractice v. the Business Judgment Rule: Differences in Hindsight Bias*, 73 Or. L. Rev. 587, 591 (1994). "[S]tudies have demonstrated not only that people claim that they would have known it all along, but also that they maintain that they did, in fact, know it all along." Jeffrey J. Rachlinski, *A Positive Psychological Theory of Judging in Hindsight*, 65 U. Chi. L. Rev. 571, 577 & n.22 (1998) (collecting sources). Unlike the process of learning from experience and predicting a future event, hindsight bias refers to the assessment of a past event. *Id.* at 577. The bias results from "the fact that those who know the outcome cannot ignore that knowledge as they try to perform an objective evaluation of the a priori condition." Arkes & Schipani, *supra*, at 593. Unsurprisingly, "the law is not blind to the influence of the hindsight bias." Rachlinski, *supra*, at 573.

In the years after the Miraca Transaction, TargetNow did not reach profitability, and Carisome did not develop a marketable product. Caris also tried unsuccessfully to sell TargetNow. The defense witnesses testified with conviction that they believed these things in fall 2011, but the contemporaneous evidence showed they did not. In fall 2011, they believed TargetNow was crossing into profitability and would continue on its promising trajectory. They believed that Carisome had a strong chance of producing a marketable product in early 2012 that would revolutionize the healthcare industry. They also believed that TargetNow could be sold for as much as $150 to $300 million based on

expressions of interest from multiple strategic buyers and advice from Caris's financial advisor.

Martino and Halbert fell into a different category. As discussed below, they both testified in substance that they sought to defraud bidders for TargetNow by knowingly providing the bidders with projections that Martino and Halbert did not believe. *See* Part II.B.1.b, *infra*. Martino's willingness to provide falsely high numbers to bidders in pursuit of a desired result—the sale of TargetNow—fit with and corroborated evidence that he provided falsely low numbers to PwC and Grant Thornton in pursuit of a different desired result—zero corporate-level tax from the Miraca Transaction.

Martino was the most deeply involved in generating the zero-tax outcome, which was critical if the Miraca Transaction was going to close. Martino knew that the PwC valuation was a tax transfer valuation, not a fair market valuation. He provided PwC with lowered projections to use in deriving its valuation, and he subsequently provided PwC with strained memos justifying the assumptions that drove the valuation. When Miraca insisted on a second opinion from Grant Thornton, Martino met with the firm before it began work and two days later predicted where the valuation exercise would end up.

Both Martino and Halbert were personally involved in determining what the option holders would receive. Martino recommended the amount, and Halbert signed off. Both knew that the Board never actually determined Fair Market Value or adjusted the options for the Spinoff. Both knew that the Board never saw the Grant Thornton report. Yet during discovery, Halbert went so far as to testify that the Board relied entirely on PwC and Grant Thornton, explaining that the directors were incapable of determining the

7

Fair Market Value of TargetNow and Carisome themselves.[5] The plaintiff's pre-trial brief so effectively dismantled the reliance theory that the defense pivoted at trial to a different explanation: the Board did *not* rely exclusively on PwC and Grant Thornton; the Board members used their extensive knowledge to determine the value of the businesses independently.[6] In contrast to Halbert's testimony that the Board was incapable of valuing those businesses, the post-trial brief asserted that "the directors independently believed that TargetNow and Carisome were collectively worth less than the $65 million concluded by PwC and used to calculate the Fair Market Value of the options."[7]

---

[5] Halbert Dep., I 118 ("The board can't value it themselves. They have to hire someone who is a professional and expert in the field to value it . . . ."); *id.* ("There's no way that a board can value assets like this."). The Company's pre-trial brief embraced the reliance defense. *See, e.g.*, Dkt. 72 at 3 ("Relying on values calculated by competent and independent valuation experts is neither arbitrary nor capricious—in fact, it is the hallmark of a process undertaken by directors acting in good faith and with due care."); *id.* at 29 ("The Board made the downward adjustment to the exercise price of the options . . . by relying, in good faith, on valuations of the Spun-Off Businesses performed by independent third-party valuation experts."); *id.* at 31 (arguing that the Board adjusted the option strike prices "in reliance on independent valuation experts"); *id.* at 34 (asserting that the Board reduced the option strike prices "relying in good faith on the valuation of the Spun-off Businesses prepared by PwC"); *id.* at 47 ("The Board Reasonably Relied On PwC's Independent Valuation").

[6] *See, e.g.*, Johansen 553, 566; Castleman 500, 502, 507; Knowles 472-73; Halbert 235, 259, 282; Martino 124, 193.

[7] Dkt. 105 at 1; *accord id.* at 22 ("The Board determined the value of the retained businesses . . . ."); *id.* at 36 ("Contrary to Plaintiff's assertions, the Board did not blindly accept the conclusions of PwC."). In a particularly stark example of the defense's reversal of position, Caris argued in its pre-trial brief that the Board relied entirely on two valuation experts—plural. *See* note 5, *supra*. In its post-trial brief, Caris conceded that Grant Thornton's report "was not relied upon by the Board . . . ." Dkt. 105 at 30.

Caris has pointed out that the option holders were Caris employees and posited that neither Halbert nor Martino set out to harm the employees. That is true. The option holders were collateral damage. The purpose of the valuation exercise was to arrive at a number that would result in zero corporate-level tax from the Spinoff, and hence zero tax liability indirectly for Halbert and Fund VI.[8] The goal was to avoid paying the IRS. But once committed to that end, Martino could not undervalue SpinCo for tax purposes while valuing it fairly for the option holders. After Halbert recognized this conundrum, he explored whether the option holders could receive replacement options in SpinCo. The exchange would have avoided the need to value the options and hence the necessity of imposing an IRS-driven valuation on the employees. But despite Halbert's pressing, legal counsel vetoed the rollover. Halbert then faced a choice between (i) a realistic valuation that would result in Halbert and Fund VI paying tax on 97% of the equity or (ii) a zero-tax valuation that would generate an unrealistically low payout for the options. Halbert chose the latter, which obviously benefitted himself.

I reach these conclusions about Martino and Halbert reluctantly. Other aspects of their testimony were credible, and I am not suggesting that either is inherently bad or malicious. Like all of us, they are multidimensional. Martino appears to have had a respectable career, and he testified to other instances when he has done the right thing. Halbert has achieved great things and, at least through Caris, devoted much of his time

---

[8] Miraca insisted on a side-letter obligating SpinCo to bear the tax. Because Halbert and Fund VI owned all of SpinCo, the obligation effectively returned to them. Achieving zero tax ultimately benefitted Halbert and Fund VI, not Miraca.

and treasure to improving the lives of others. But humans respond to incentives, and powerful incentives can lead humans to cross lines they otherwise would respect.[9] This is particularly true when the transgression can be rationalized, the benefits are immediate and concrete, and the potential costs are distant, conditional, and readily discounted by the chance of detection and the possibility of a successful defense or settlement.[10]

---

[9] *See, e.g.*, JONATHAN R. MACEY, THE DEATH OF CORPORATE REPUTATION 134 (2013) (explaining implications of demands for client-retention on auditor reliability); Mei Feng et al., *Why do CFOs Become Involved in Material Accounting Manipulations?*, 51 Journal of Acct. & Econ., 21 (2011) (positing that CFOs engage in accounting manipulation due to pressure from CEOs rather than a desire for personal gain); Mark Peecher, *The Influence of Auditors' Justification Processes on Their Decisions: A Cognitive Model and Experimental Evidence*, 34 J. Acct. Res. 125 (1994) (demonstrating that auditors whose supervisors want them to accept their clients' explanations for account balance discrepancies often adopt those explanations without testing them); Julian J. Z. Polaris, *Backstop Ambiguity: A Proposal for Balancing Specificity and Ambiguity in Financial Regulation*, 33 Yale L. & Pol'y Rev. 231, 261 (2014) (observing "that rational and well-intentioned people can fall prey to the pernicious effects of chronic underestimation of risk and overestimation of compliance, especially when those self-serving biases are reinforced by internal feedback loops within the company"). The idea is not new: "[A] range of human motivations, including but by no means limited to greed, can inspire fiduciaries and their advisors to be less than faithful." *In re El Paso Corp. S'holder Litig.*, 41 A.3d 432, 439 (Del. Ch. 2012) (Strine, C.).

[10] *See, e.g.*, MACEY, *supra* note 9, at 91 ("But swindling often is so enormously profitable that massive piles of money remain. And these massive piles of money provide a strong incentive to cheat, because not only is getting away with it incredibly profitable, but getting caught is not as bad as people used to think."); *id.* at 90-96 (describing effects of reduction in personal accountability); *id.* at 135 (arguing that "competent professionals within failed firms . . . do not suffer much, if any, personal damage"); Pamela H. Bucy et al., *Why Do They Do It?: The Motives, Mores, and Character of White Collar Criminals*, 82 St. John's L. Rev. 401, 406-18 (2008) (discussing motivations for engaging in white collar crime); Steven M. Davidoff et al., *The SEC v. Goldman Sachs: Reputation, Trust, and Fiduciary Duties in Investment Banking*, 37 J. Corp. L. 529, 543-46 (2012) (describing the cultural shift away from reputation-based norm where "the need to protect the firm's reputation informed every one of its partners' decisions" towards a transactional business model focused on immediate profit); Robert A. Prentice, *Beyond*

In this case, the goal was closing the Miraca Transaction. Achieving that goal required a valuation that resulted in zero corporate-level tax. Halbert benefited the most from achieving that goal. Martino worked for Halbert. Martino ensured that the tax issue was resolved, then Halbert approved the result that Martino achieved.

## A. Caris And Its Business Units

In 1987, Halbert founded what became AdvancedPCS, a leading prescription benefit plan administrator. In 2003, Halbert sold it for $7 billion. During the sale process, Halbert's mother died from multiple myeloma. After witnessing firsthand the state of the art in cancer treatment, Halbert became convinced that personalized medicine could revolutionize that discipline and healthcare in general. Thanks to the successful sale of AdvancedPCS, Halbert had the resources to pursue his newfound passion.

In 2005, Halbert founded Caris. It would develop advanced diagnostic and prognostic tools to enable doctors to more easily identify specific medical conditions, such as particular types of cancer. It also would develop "theranostic" tools, a turn-of-the-century portmanteau of "therapy" and "diagnostic." The term refers to a medical test that identifies a variant of a condition well-suited for a specific form of treatment.

---

*Temporal Explanations of Corporate Crime*, 1 Va. J. Crim. L. 397 (exploring nonmonetary factors that affect decisions leading to white-collar crime); Sally S. Simpson & Nicole Leeper Piquero, *Low Self-Control, Organizational Theory, and Corporate Crime*, 36 Law & Soc'y Rev. 509, 535 (2002) (observing phenomenon in which "illegal acts become so commonplace or normalized within the corporate culture that insiders come to view them as acceptable").

In 2005, Caris bought a company that became Caris Diagnostics, which witnesses generally called the anatomic pathology or "AP" business. The concept of anatomic pathology refers to the diagnosis of human disease through the examination of cells, fluids, and tissues. Professionals working for the AP business examined biopsies and blood samples for indications of gastrointestinal, dermatologic, genitourinary, and hematologic diseases. Caris Diagnostics established itself in the medical community and generated steady returns. Halbert saw its reliable cash flows as a means of supporting more novel, developmental-stage ventures.

In 2008, Caris purchased a company that became TargetNow. This business profiled the genetic and molecular changes unique to a cancer patient's tumor, then identified treatments based on the tumor's profile. Traditionally, doctors diagnose cancer and prescribe treatments based on the cancer's location. Certain therapies represent the standard of care for lung cancer, others for liver cancer, and still others for brain cancer. The insight driving TargetNow was that tumors respond to treatment based on their genetic makeup, not their location. By matching treatment options to the particular tumor, TargetNow could identify efficacious therapies that otherwise would not be considered.

Also in 2008, Caris acquired a company that held patents for blood-based molecular tests. Caris used the patents to develop its Carisome business, which sought to develop simple blood tests that could detect specific cancers and other complex diseases. Such a test would allow doctors to screen patients more easily and detect cancers at an earlier stage when they could be treated more effectively.

12

**B.      Carisome And TargetNow Encounter Difficulties.**

Although Carisome and TargetNow had great promise, both encountered difficulties. In 2010, after nearly two years of research and development, Carisome launched its first product: a blood test for detecting prostate cancer. Unfortunately, it did not work in the field. After another year of effort, Carisome tried again, but the second version failed as well. The technology could identify cancer in the blood sample, but not a specific type of cancer. The test served as a general alarm, not a screening device. In addition, sample collection was complicated, and Carisome could not obtain sufficient quantities of the antibodies needed for commercial production.

TargetNow also faced challenges. Unlike Carisome, the cancer profiling service worked, but gaining market share proved difficult. In essence, doctors had to change how they thought about cancer. As noted, the traditional standard of care was to treat tumors based on their location. The insight driving TargetNow was that tumors responded to treatments based on their genetic makeup. As logical as it sounds, it was revolutionary thinking. With patients' lives on the line, doctors were reluctant to make the leap without clinical data demonstrating the efficacy of the new approach. Plus TargetNow was expensive, and insurance companies often would not cover it. Another problem was that hospitals had their own oncology labs. They perceived TargetNow as another competitor and resisted attempts by their doctors to use it.

Despite these setbacks, Halbert and the Board continued to have high hopes for both businesses. They saw TargetNow as a unique and vastly superior approach that would steadily gain converts. *See* Halbert Dep., I 26, 84. They also believed Carisome

13

eventually would develop a functional product. Once it did, the addressable market would be in the hundreds of billions. As Halbert explained at trial, a successful Carisome product "would be the largest product launch in the history of mankind." Halbert 236.

## C. The Board Explores Options For Raising Capital.

Caris supported TargetNow and Carisome by borrowing money on the strength of the AP business's cash flows. By March 2011, the Board was concerned that Caris was approaching the limits of its existing debt agreements. At the time, the Board's members were:

- Halbert, who served as Chairman and CEO.

- Laurie Johansen, who served as President of Caris Diagnostics and as a Vice Chairman of the Board. She had worked for Halbert as an executive at AdvancedPCS and, after the acquisition, continued to work for him in his family office. She functioned as a senior executive at Caris.

- Dr. Jonathan Knowles, who split his time working for Caris and as a professor of translational medicine in Switzerland. He also served as a Vice Chairman of the Board. Knowles received $540,000 per year from Caris.

- Peter Castleman, a principal at JH Whitney, the private equity firm that managed Fund VI. JH Whitney had backed AdvancedPCS and received an excellent return on its investment. Castleman and JH Whitney were strong believers in Halbert's entrepreneurial acumen.

- Dr. George Poste, who was an outside director with a distinguished academic resume. He also acted as a consultant to healthcare companies and served as a director of other science companies, including Monsanto.

- Stephen Green, who was another outside director. He had held senior positions with General Electric's corporate finance, venture capital, and leveraged buyout businesses. After retiring from GE, he joined an investment fund where he specialized in financing companies involved in healthcare, information technology, and manufacturing. That firm does not appear to have invested in Caris.

14

In April 2011, the Board began considering strategic alternatives and retained Citigroup Global Markets ("Citi") as its investment advisor. One possibility was an initial public offering ("IPO") of shares in a subsidiary that would own the AP business and possibly TargetNow. Particularly if the TargetNow business were included, the IPO would require an internal reorganization and raise significant tax issues.

To vet the tax issues, Caris turned to PwC, which previously had helped Caris with a tax-driven internal reorganization. In April 2010, PwC had provided a valuation to support the transfer of Carisome's intellectual property to a Gibraltar-domiciled subsidiary that could benefit from that jurisdiction's favorable tax laws. At the time, PwC used the cost-basis method to value Carisome's intellectual property at $10.25 million as of March 31, 2010. JX 12 at CDX34388; JX 14.

In April 2011, PwC was just starting its tax planning, and all the firm needed was a sense of TargetNow's value as a going concern. PwC asked Martino for his view. Martino told PwC that he believed TargetNow was worth between $150 and $300 million. He based this estimate on projected annual revenue of $70 million and projected EBITDA of $13 million. JX 27. PwC treated Martino's estimate as reliable and used it in its preliminary analysis, including in a presentation to the Board.

**D.    Citi Provides Its Recommendations To The Board.**

On May 25, 2011, Citi gave the Board a presentation that discussed a series of strategic alternatives, including a high-yield debt financing, an IPO, and the sale of either all of Caris or a subset of its businesses. *See* JX 37. The presentation provided the most detail on three alternatives: (i) the sale of Caris as a whole, (ii) a sale of the AP business,

and (iii) an IPO. The presentation indicated that in addition to obtaining funds to finance TargetNow and Carisome, Halbert and Fund VI were interested in receiving a return.

Citi noted that selling Caris as a whole was the most straightforward and would "[m]aximize up-front proceeds for Caris shareholders." *Id.* at CDX46514. At the same time, Citi warned that buyers might not assign full value to TargetNow and Carisome and that selling these businesses at their current stage of development would reduce the stockholders' potential upside. *Id.*

Citi noted that Caris could achieve a tax-efficient sale of the AP business through a spin/merge structure. If Caris sold the AP business outright and then distributed cash to its stockholders, the proceeds would be subjected to double taxation: first at the corporate level when Caris paid taxes on its gain from the sale, then again at the stockholder level when cash was distributed. In the spin/merge structure, Caris would spin off TargetNow and Carisome, then merge with the acquirer. Through the merger, stockholders could receive full value for the AP business and only be taxed at the stockholder level. They could then finance the spun-off entity by re-investing a portion of their proceeds.

The last alternative was an IPO of a minority stake in the AP business and TargetNow. Citi projected that an IPO could raise $200 million, with Caris receiving $100 million from the primary offering and Halbert and Fund VI receiving $100 million through a secondary offering. Citi anticipated that the equity issuance would be combined with a $250 million bond offering. Halbert and Fund VI would receive a dividend from the bond offering for total proceeds of approximately $164 million. *See id.* at CDX46522.

16

As part of its analysis, Citi developed valuation ranges for the AP business and TargetNow. Citi did not attempt to value Carisome. Citi's analysis of the AP business assumed revenue of $295 million and EBTIDA of $74 million. Using revenue multiples of 2.6x to 4.0x and EBITDA multiples of 13.0x to 20.0x, Citi valued the AP business at $767 to $1,180 million. *Id.* Citi's analysis of TargetNow assumed $75 million in revenue and $0 EBITDA. *Id.* n.1. Using the same revenue multiples, Citi valued TargetNow at $195 to $300 million. Citi's range was consistent with the numbers Martino gave PwC.

**E.     The Sale Process For The AP Business**

The Board decided to explore a sale of the AP business. Tai Hah was the lead banker for Citi. Martino acted as the principal point of contact at Caris. Citi kicked off the process in June and followed a schedule leading up to final bids in September 2011.

Citi initially contacted twenty-three strategic and financial buyers. Nineteen signed non-disclosure agreements and seventeen received the Confidential Information Memorandum, which provided detailed information and financial data about the AP business. JX 50 at CDX7390. The memorandum included marketing materials that provided high-level information about TargetNow.

Citi asked for expressions of interest from parties who wished to participate in the second round of the process. Ten potential bidders submitted expressions of interest with most clustering in the range of $600 to $700 million. Three were strategic buyers; the others were financial buyers. Two of the strategic buyers volunteered their interest in TargetNow. *See* JX 38 at CDX46485. Three more strategic buyers—Miraca, Danaher Corp., and Illumina, Inc.—entered the process after initial indications were due. Miraca

17

proposed to buy the AP business for $650 to $700 million and also expressed interest in TargetNow. Although Citi only asked for an indicative range for the AP business, Danaher expressed interest in buying both the AP business and TargetNow for total consideration of $825 to $900 million. Illumina also wanted to explore an acquisition of both businesses and was a sufficiently credible buyer that Citi did not require an expression of interest. JX 72.

During the second phase of the process, interested parties received presentations on TargetNow. As part of the presentation, Caris described the business's strong revenue growth. When Caris acquired TargetNow's predecessor in 2008, it paid $40 million for a business that was generating approximately $1 million in annual revenue. Over the next three years, Caris grew TargetNow's annual revenue to approximately $50 million. To illustrate this success graphically, the presentation materials included the following chart:



JX 44. The presentation materials also included projections for TargetNow. *See* JX 43; JX 54. Martino and his team prepared the projections, and the Board reviewed and approved them. The projections forecast that if TargetNow's growth continued at a linear rate, market share would increase from 4.1% in 2011 to 19.4% in 2016. In an upside scenario, Caris projected that TargetNow's market share would reach 34.5% in 2016. The following chart depicts the revenue and EBITDA figures for TargetNow that Caris provided to bidders:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| *Base Case With Current Pricing* | | | | | | |
| Revenue | 63,438 | 93,330 | 129,147 | 184,005 | 235,077 | 267,568 |
| EBITDA | 1,820 | 11,026 | 22,352 | 41,591 | 59,156 | 68,829 |
| *Base Case With Value Pricing* | | | | | | |
| Revenue | 63,438 | 93,330 | 262,330 | 373,759 | 477,500 | 543,497 |
| EBITDA | 1,820 | 11,026 | 88,944 | 136,469 | 180,367 | 206,794 |
| *Upside Case With Current Pricing* | | | | | | |
| Revenue | 63,438 | 126,377 | 200,730 | 305,623 | 406,229 | 476,667 |
| EBITDA | 1,820 | 9,006 | 13,258 | 31,320 | 76,768 | 104,358 |
| *Upside Case With Value Pricing* | | | | | | |
| Revenue | 63,438 | 126,377 | 407,732 | 620,796 | 825,152 | 968,229 |
| EBITDA | 1,820 | 9,006 | 220,261 | 346,493 | 495,691 | 595,920 |

During this litigation, Martino testified that he did not believe any of the projections that Caris gave to the bidders. Halbert said the same thing.

After receiving the presentation, Illumina sought an indication from Citi regarding the value that Caris placed on TargetNow. Citi suggested that Caris valued TargetNow in the range of $200 to $250 million. Citi's lead banker, Hah, reported the conversation to Halbert and Johansen, who did not disagree. That figure was consistent with Martino's estimate in April 2011 that TargetNow was worth $150 to $300 million, as well as Citi's estimate that same month that that its value was between $195 to $300 million.

Elsewhere, Hah gave a back-of-the-envelope estimate for what a buyer would pay as "[p]robably couple of hundred million." JX 60. In the same email, Hah accurately estimated that the AP business would generate bids in the vicinity of $700 million. *Id.*

Of all the buyers, TPG seemed the most interested in Carisome and asked numerous questions during due diligence. In response, Citi sent TPG a presentation which estimated that if Carisome could develop a successful product, the commercial opportunities would approach $130 billion. JX 67 at CDX12101. The potential global market for a blood test for prostate cancer alone was worth $8.8 billion.

During the sale process, Halbert debated whether to sell just the AP business or also sell TargetNow. *See* JX 55 ("DH may sell TargetNow depending on price."); JX 82 ("DH changes his mind on that [selling both] all the time . . . ."). He considered selling the AP business to one buyer and TargetNow to another. *See* JX 52. He ultimately decided to sell only the AP business with the possibility of selling TargetNow later. He was not willing to consider selling Carisome, which he saw as having a potentially revolutionary technology. Citi noted internally that Halbert was "thinking in billions for the Carisome stuff." JX 65.

## F.    PwC Works On The Tax Issues.

During August 2011, as the sale process heated up, PwC began concentrating on the tax issues. The valuation of TargetNow and Carisome was critical to achieving a tax-efficient result. Under Section 355(e) of the Internal Revenue Code, RemainCo would recognize taxable gain from the Spinoff as if it had sold TargetNow and Carisome to Caris's stockholders for the fair market value of those businesses on the date when the

20

Spinoff occurred. *See* 26 U.S.C. § 355(e)(1). If the fair market value of those businesses exceeded their tax basis, then RemainCo would owe tax on the difference. Critically, because the acquirer of the AP business would own RemainCo post-Merger, the acquirer would foot the tax bill. The last thing any acquirer wanted was to pay for the AP business, then pay tax on top of that for the gain on a deemed sale of TargetNow and Carisome in the Spinoff. But if the value of TargetNow and Carisome was less than Caris's basis in those entities, then the Spinoff would result in zero corporate-level tax.

David Parrish was the lead PwC partner for the tax engagement. On August 16, 2011, a member of Parrish's team asked Martino and Dan Sawyers, the Chief Accounting Officer for Caris, to provide "additional information in order to complete the valuations and the basis and E&P studies needed to quantify the consequences of [the Spinoff]." JX 59. Among other things, PwC asked for financial projections for ten years. In the ordinary course of business, Caris did not create ten-year projections.

Martino told Sawyers to "us [sic] the TN projections used in the stock valuation analysis." *Id.* The "stock valuation analysis" was the latest in a series of stock option-related valuations that Grant Thornton had prepared for Caris. Federal law requires that if an issuer wants to avoid generating immediate income for a recipient of stock options, then the exercise price for the option must be equal to or greater than the "fair market value of the stock at the time such option is granted . . . ." 26 U.S.C. § 422(b)(4). IRS regulations require that a non-public company determine fair market value by taking into account "the company's net worth, prospective earning power and dividend-paying

21

capacity, and other relevant factors." 26 C.F.R. § 20.2031–2(f)(2). Serious penalties attach when taxpayers make false statements to the IRS.[11]

To satisfy their reporting obligations, non-public companies typically commission an opinion about the fair market value of their stock. Grant Thornton regularly prepared valuations for Caris to use for income tax and financial statement reporting related to the issuance of stock options. As an initial step, Grant Thornton valued each of Caris's three component businesses. Each time, management provided Grant Thornton with projections for each business including a base case, a downside case, and an upside case.

Grant Thornton used the projections to prepare discounted cash flow valuations for the three businesses. Grant Thornton also derived revenue and EBTIDA estimates from the projections, which it used to prepare a comparable company valuation for each business. Because of the methods Grant Thornton used, the values were determined as of a future date, such as December 31, 2014. Grant Thornton then calculated a weighted average valuation for each business, which it used to develop a sum-of-the-parts valuation for Caris. Grant Thornton then calculated the fair market value of an individual share and discounted that figure back to the valuation date.

One disadvantage of Grant Thornton's method is that the values of the component businesses are future values that must themselves be discounted back to the valuation

---

[11] *See, e.g.*, 26 U.S.C. § 6662 (civil penalty for accuracy-related tax underpayment); *id.* § 6663 (civil penalty for fraudulent tax underpayment); *id.* § 6701 (civil penalty for aiding and abetting understatement of tax liability); *id.* § 7201 (criminal penalty for willfully attempting to evade or defeat tax).

date. Fortunately, Grant Thornton calculated business-specific discount rates that can be used for that purpose. One advantage of Grant Thornton's method is that the future values can be discounted back to a different valuation date. In this case, PwC and Grant Thornton valued SpinCo as of October 31, 2011. For an apples-to-apples comparison, the future values generated in Grant Thornton's stock option valuations can be discounted back to October 31, 2011 as well. Exhibit A to this opinion collects the different Grant Thornton valuations. Where possible, it calculates present values of the individual businesses as of the valuation date for each report and separately calculates present values as of October 31, 2011.

In July 2011, Martino and his team had created projections for Grant Thornton to use in its latest stock option-related valuation. Not surprisingly, Martino told Sawyers to send those to PwC. Sawyers responded that to derive the ten-year projections that PwC had asked for, he would start with the projections that management provided to Grant Thornton, then extend them by "keep[ing] the same trajectory as year 5 growth." JX 59. Martino approved, saying "Sounds good." *Id.* Sawyers used this approach for the downside case, base case, and upside case projections, and he sent an Excel spreadsheet containing all three sets to PwC. Martino stressed at trial that he did not see the spreadsheet before it went out, but he had told Sawyers which projections to use and approved the methodology that Sawyers proposed.

Except for 2011 EBITDA, the first five years of the base case projections for TargetNow that Sawyers sent to PwC were materially lower than the projections that Caris provided to potential bidders. Even the upside case was materially lower. The

following table compares the base case and upside case projections for 2011-2017 that Sawyers sent PwC with the projections that Caris gave to bidders:

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| *Sawyers Base Case As Sent To PwC* | | | | | | |
| Revenue | 61,674 | 84,507 | 96,474 | 106,121 | 116,733 | 124,905 |
| EBITDA | 2,691 | 9,344 | 10,943 | 12,840 | 14,991 | 16,977 |
| *Sawyers Upside Case As Sent To PwC* | | | | | | |
| Revenue | 61,674 | 87,525 | 104,264 | 117,818 | 133,134 | 146,448 |
| EBITDA | 2,691 | 10,340 | 13,646 | 16,667 | 20,205 | 23,231 |
| *Bidder Base Case With Current Pricing* | | | | | | |
| Revenue | 63,438 | 93,330 | 129,147 | 184,005 | 235,077 | 267,568 |
| EBITDA | 1,820 | 11,026 | 22,352 | 41,591 | 59,156 | 68,829 |
| *Bidder Base Case With Value Pricing* | | | | | | |
| Revenue | 63,438 | 93,330 | 262,330 | 373,759 | 477,500 | 543,497 |
| EBITDA | 1,820 | 11,026 | 88,944 | 136,469 | 180,367 | 206,794 |
| *Bidder Upside Case With Current Pricing* | | | | | | |
| Revenue | 63,438 | 126,377 | 200,730 | 305,623 | 406,229 | 476,667 |
| EBITDA | 1,820 | 9,006 | 13,258 | 31,320 | 76,768 | 104,358 |
| *Bidder Upside Case With Value Pricing* | | | | | | |
| Revenue | 63,438 | 126,377 | 407,732 | 620,796 | 825,152 | 968,229 |
| EBITDA | 1,820 | 9,006 | 220,261 | 346,493 | 495,691 | 595,920 |

In my view, the contrast between the sets of projections fits the typical scenario in which a seller gives stretch projections to bidders to induce a higher bid, but has more realistic internal projections that it uses in the ordinary course of business. Here, Sawyers sent PwC the more realistic internal projections that management had developed for Grant Thornton to use in its next valuation report for stock option reporting.

## G.    Final Bids

Citi scheduled September 12, 2011, as the date for interested parties to submit final bids for the AP business. Miraca, Danaher, Illumina, and PerkinElmer asked about also bidding for TargetNow. Citi told them that Halbert had decided to wait. Caris would

take bids for the AP business, then determine what to do on TargetNow. Citi indicated that Halbert understood their interest in TargetNow and was open to a separate deal.

On September 9, 2011, Danaher told Caris that it would not be bidding on the AP business but was interested in a stand-alone acquisition of TargetNow. Danaher offered to begin immediately and work quickly. *See* JX 86. Citi again told Danaher to wait.

On the bid deadline, Miraca submitted a bid of $725 million for the AP business. JX 88. PerkinElmer submitted a bid of $650 million. JX 89. Both bidders expressed their continued interest in acquiring TargetNow.

Miraca's bid was superior. Although Caris engaged further with both PerkinElmer and Miraca, the Board selected Miraca as its transaction partner.

## H.    PwC Achieves Zero Tax.

Miraca's bid letter identified the tax issues presented by the Spinoff and made clear that it did not want to be responsible for any taxable gain. On September 21, 2011, Miraca supplemented its initial bid letter with an additional letter that stressed the importance of the tax issues: "Given the significant potential tax implications relating to the Separation, the parties agreeing on a reasonable valuation of the separated businesses, as well as finalizing a Separation Agreement, would be condition [sic] to the signing of the Merger Agreement." JX 102 at CDX24007.

With Miraca's letters in hand, Martino instructed PwC to "come up with a tax transfer valuation for TargetNow and Carisome to determine the tax liability." Martino 60-61. On September 20, 2011, Martino sent PwC revised projections to use for purposes of their valuation. Later that day, he gave PwC the bogey to hit. His email stated:

Guys,

A real point of issue for the buyer is getting comfortable with the tax liability at closing. Can you guys prepare something in draft based on a 40 million or so valuation on RetainCo and the financial information on results for 2011 that I sent this morning? Thanks!!!!!

JX 96. Parrish understood. He responded saying, "We're on it." JX 97.

The "financial information" that Martino sent consisted of reduced forecasts for TargetNow. He started with the same projections that Sawyers sent PwC in August. As noted, those projections were prepared in the ordinary course of business for use by Grant Thornton and were materially more conservative than the projections that Caris had given to bidders. Martino kept the same top line revenue figures, but he cut the EBITDA across the board. Metadata from the spreadsheet shows that Martino created the projections on the morning of September 20, 2011, then emailed them to PwC at 8:35 a.m. After that, the file was never amended or adjusted. The following table shows the reductions Martino made to the August projections that Sawyers previously sent PwC:

| Year | Revenue | August EBITDA | August EBITDA As % of Revenue | September EBITDA | September EBITDA As % of Revenue | % Reduction In EBITDA |
|---|---|---|---|---|---|---|
| 2011 | 61,674,000 | 2,691,000 | 4.36% | -2,284,000 | -3.70% | 184.88% |
| 2012 | 84,507,000 | 9,344,000 | 11.06% | -422,000 | -0.49% | 104.52% |
| 2013 | 96,474,000 | 10,943,000 | 11.34% | 2,428,000 | 2.51% | 77.83% |
| 2014 | 106,121,000 | 12,840,000 | 12.09% | 4,241,000 | 3.99% | 66.97% |
| 2015 | 116,733,000 | 14,991,000 | 12.84% | 6,006,000 | 5.14% | 59.94% |

The next day, Parrish emailed back with the answer he knew Martino wanted: "Jerry – please see attached model below. We are at zero tax." JX 99. The model valued TargetNow at $47 million and Carisome at $15 million.

Later on September 21, 2011, PwC sent Martino a revised valuation. Perhaps the PwC team noticed that although they had delivered "zero tax," the aggregate value of $62 million exceeded the "40 million or so" that Martino had requested. The new model "reduced the Base Case value of the [TargetNow] technology from USD 47.234 to USD 32.900 million." JX 100. With another $15 million for Carisome, the aggregate value was now at $48 million.

Martino wrote back, "I'm staying with the old version. Thanks!" JX 101. Once the goal of zero-tax was achieved, then there was no benefit to being more aggressive.

Overwhelming evidence in the record makes clear that in rendering its decision, PwC did not determine the fair market value of TargetNow and Carisome. PwC's engagement letter, dated September 6, 2011, specified that PwC was being engaged to "provide an arm's-length range of the fair market value of the TargetNow IP," defined as the intellectual property of TargetNow. JX 80. PwC also stated that its engagement would include "update[ing] its previous analysis of the value of the [Carisome] IP." *Id.* Martino agreed that PwC was "engaged to do the valuation for tax purposes" and produced "an IP transfer valuation . . . ." Martino Dep. 164; *accord* Martino 84-85.

A transfer pricing valuation of intellectual property is not the same as a determination of the fair market value of a business. PwC explained this point in an email to Miraca and its advisors:

> The valuation under review considers a transfer pricing view of the transaction—an analysis of the sale of US-owned assets to a non-US related party under the arm's length standard—that may not equate to the definition of fair market value under Revenue Ruling 59-60, or to the concept of fair value in the financial reporting context.

27

JX 119 at CDX30894. Martino agreed. Martino Dep. 78-79, 172-74. So did Parrish, the lead partner for PwC. Parrish Dep. 78-79.

Although Martino told PwC that he was "staying with the old version," it turned out that additional steps were necessary to justify the low value that PwC placed on Carisome. Parrish's email dated September 20, 2011, in which he informed Martino that PwC had achieved "zero tax," included internal emails among the PwC team. One of the team members questioned the $15 million valuation for Carisome:

> As I mentioned on the call earlier today, I am still a bit perplexed on the $26M of tax basis in the Gibco stock [the holding company for Carisome] and a fair value of $15M [for the Carisome IP]. Given its recent formation and background, this surprises me.

JX 99 at CDX34852. The problem was that PwC was valuing Carisome using the cost-basis method. Under that approach, PwC valued Carisome's technology according to what Caris had invested in it. Consequently, the tax basis of the technology and the tax basis of the holding company that owned the technology should not have diverged. Yet as the PwC email pointed out, they did.

To address the issue, Martino sent PwC a spreadsheet on September 22, 2011, that tracked the monthly R&D spending for Carisome from January 2010 to August 2011. But the total was $31.838 million, more than the $26 million used for the holding company and more than twice the value PwC had placed on the IP. Martino instructed PwC to exclude the spending from March 2010 through March 2011 because it related to the first blood-based testing product that had failed commercially. Martino later instructed PwC to exclude the R&D spending from April to June 2011 as well. JX 111.

28

During the same period, Grant Thornton was working on the stock option-related valuation for grants made during the first quarter of 2011. Grant Thornton had projections from management for all three businesses, including Carisome. The following table shows that the EBITDA figures for TargetNow were closer to the August version that Sawyers prepared, rather than the September version with Martino's cuts.

| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| *Sawyers Base Case As Sent To PwC* | | | | | | |
| Revenue | 61,674 | 84,507 | 96,474 | 106,121 | 116,733 | 124,905 |
| EBITDA | 2,691 | 9,344 | 10,943 | 12,840 | 14,991 | 16,977 |
| *Martino Base Case As Sent To PwC* | | | | | | |
| Revenue | 61,674 | 84,507 | 96,474 | 106,121 | 116,733 | 124,905 |
| EBITDA | -2,284 | -422 | 2,428 | 4,241 | 6,006 | 23,231 |
| *Grant Thornton Base Case* | | | | | | |
| Revenue | 63,613 | 84,507 | 96,474 | 106,121 | 116,733 | N/A |
| EBITDA | 216 | 5,686 | 8,823 | 12,489 | 16,781 | N/A |

Martino did not give Grant Thornton the lowered projections for TargetNow. He simply told them to stop working on their valuation.

## I.  Miraca Insists On A Second Opinion From Grant Thornton.

On September 22, 2011, Martino forwarded PwC's valuation of $62 million to Deloitte, Miraca's tax advisor. The advisors subsequently held a call to discuss the Spinoff. Deloitte had a number of questions about PwC's work and regarded what had been provided as falling short of what was promised. PwC initially was not responsive. Miraca's bankers then reached out to Citi, who contacted Halbert directly. Halbert made clear that Caris and PwC needed to be fully responsive.

Deloitte requested a wide range of valuation materials from Caris and PwC. One of the next items in the record after Deloitte's request is an email from Martino to PwC

that attached a three-page memorandum seeking to justify the September projections for TargetNow. Recall that those projections anticipated approximately the same top line revenue as Grant Thornton's draft valuation, but that Martino cut the EBITDA. Martino's memo attributed the changes predominantly to an increased allocation of SG&A.

On September 26, 2011, Caris, PwC, and Deloitte convened a call during which PwC made a presentation to defend its valuation of Carisome's intellectual property. Among other things, the presentation sought to explain why PwC excluded $25 million in development costs. PwC prepared a supporting memorandum in which it advised Caris that the tax treatment was appropriate. *See* JX 116.

Deloitte remained skeptical of PwC's valuation work. After the call, Deloitte re-circulated a list of specific valuation questions that it still wanted answered, including the following:

- Is there any support for the discount rate calculation?
- Explain why there are no cash flow adjustments such as change in working capital, depreciation and capex
- Explain what the routine return amounts are
- Have you performed a market approach looking at comparable companies or transactions?
- Please provide a list of comparable companies

JX 117. Deloitte asked whether Clarient was a comparable company. In October 2010, GE Healthcare had acquired Clarient for $580 million, representing a multiple of 5.3x revenue. In presentations to the Board, Caris had identified Clarient as a competitor of TargetNow, and after the transaction was announced, Halbert and Citi invited GE

representatives to visit Caris to show them that TargetNow was a superior offering that GE should purchase. Deloitte logically thought that the Clarient transaction should be used as a data point for valuing TargetNow.

Martino responded to Deloitte's request about comparable companies by preparing a memorandum which argued that Clarient was not a comparable company. JX 118. PwC asserted in its responses that there were no comparable companies. *Id.* Yet Grant Thornton had used a comparable companies analysis to value TargetNow for two valuation reports in February 2011 (JX 22 & JX 23), a valuation report in April 2011 (JX 26), a valuation report in May 2011 (JX 35), and a draft report in July 2011 (JX 42). Fund VI also valued TargetNow using comparable companies. *See* JX 191 at JHW875.

Like Deloitte, Miraca's outside counsel expressed concern about the valuation of TargetNow and Carisome. In an email to Martino and others dated September 29, 2011, counsel stated:

> Relating to the valuation of the spun off businesses, it would help if we could review the current financial projections of TargetNow, Carisome and Pharma, including backup regarding the rationale and assumptions made thereof. Could you also confirm whether these projections have been reviewed and authroized [sic] by the board of directors.

JX 126. Martino responded that "[t]he projections have been reviewed and approved by David [Halbert] and JH Whitney. All the information we have has been provided to Deloitte via the PWC valuation." *Id.* Those statements do not appear to be accurate. There is nothing in the record to suggest that Halbert or Fund VI approved the projections he sent in September to PwC. The metadata from the projections shows that Martino created them on the morning of September 20, then emailed them to PwC at 8:35 a.m.

31

The only projections that the Board reviewed for TargetNow were the materially higher projections provided to the bidders.

By the end of September 2011, despite the extensive back and forth between advisors, Miraca remained uncomfortable on the valuation front—to the point where it suggested seeking a ruling from the IRS on the valuation issues before completing the Spinoff. *See* JX 130. With the signing of a final transaction agreement contemplated for the following week, Miraca and Caris appear to have compromised. Caris would provide a side letter indemnifying Miraca for any tax liability, and Caris would obtain a second valuation from Grant Thornton.

## J.    The Board Approves The Transaction.

On October 5, 2011, the Board met telephonically with Citi, PwC, its legal counsel, and Caris executives to consider and approve an Agreement and Plan of Merger with Miraca. JX 144 (the "Merger Agreement" or "MA"). The closing of the Merger was conditioned on the completion of the Spinoff, to be governed by a Separation and Distribution Agreement. JX 174 (the "Separation Agreement" or "SA"). As Caris and Miraca had agreed, the Merger Agreement obligated Caris "to obtain a valuation report with respect to the Separated Businesses [*i.e.*, TargetNow and Carisome] from Grant Thornton LLP." MA § 5.17.

The Merger Agreement called for each non-dissenting share of RemainCo common stock to be converted into the right to receive $4.46 in cash. The Merger Agreement provided that stock options would be treated as follows:

At the Effective Time, each in-the-money Company Option issued and outstanding immediately prior to the Effective Time shall be converted into the right to receive the Option Payment with respect to such Company Option and its portion of any Residual Funds payable to the Participating Sellers in accordance with the terms of this Agreement. As of the Effective Time, all Company Options shall no longer be outstanding and shall automatically be canceled and retired and shall cease to exist, and each holder of any Company Option shall cease to have any rights with respect thereto, except as otherwise provided for herein or by applicable Law.

*Id.* § 2.08(d) (the "Option Conversion Provision"). The Merger Agreement defined the

"Option Payment" as

an amount equal to (a) the product of (i) the Per Share Common Payment . . . *multiplied* by (ii) the aggregate number of Company Common Shares issuable in respect of such Company Option outstanding as of immediately prior to the Effective Time, *minus* (b) the aggregate exercise price that would be paid to the Company in respect of such Company Option had such Company Option been exercised in full immediately prior to the Effective Time, in each case, in accordance with the terms of the applicable option agreement with the Company pursuant to which such Company Option was issued and without regard to vesting or any other restriction upon exercise and assuming concurrent payment in full of the exercise price of such Company Option solely in cash.

*Id.* § 1.01. The Merger Agreement defined the "Per Share Common Payment" as the

result of the following formula:

(a) the difference of (i) the Purchase Price, *minus* (ii) the Escrow Amount, *minus* (ii) [sic] the Seller Representative Expense Amount, *minus* (iv) the aggregate amount of (A) Per Share Series A Preferred Payments, (ii) [sic] Per Share Series B Preferred Payments and (iii) [sic] Per Share Series C Preferred Payments, in each case to the extent such payments constitute Liquidation Preferences and not Alternative Amounts, [*divided*] *by* (b) the number of Aggregate Company Shares Deemed Outstanding.

*Id.*

Two aspects of the Option Conversion Provision stand out. First, the Option

Conversion Provision purported to effectuate the "conversion" of the in-the-money

33

options by operation of the Merger and to deem all of the options cancelled as a result. Second, the Option Conversion Provision purported to convert the options into consideration tied to the Per Share Common Payment, which incorporated a withholding for the "Escrow Amount." The Merger Agreement defined the Escrow Amount as $40,000,000. *Id.* § 2.10(b)(i). The option holders then would have the opportunity to receive back a portion of the escrow as additional merger consideration as part of the release of any "Residual Funds," defined to include any amounts left over from the Escrow Amount after all claims against it had been released or satisfied. *Id.* § 1.01.

Importantly, the Plan provided for different treatment of options in the event of a merger. Section 12.3 of the Plan stated:

> *Change of Control – Asset Sale, Merger, Consolidation or Reverse Merger.* In the event of a dissolution or liquidation of the Company, or any corporate separation or division, including, but not limited to . . . a reverse merger in which the Company is the surviving entity, but the shares of Common Stock outstanding immediately preceding the merger are converted by virtue of the merger into other property . . ., then, the Company, to the extent permitted by applicable law, but otherwise in the sole discretion of the Administrator may provide for . . . (iv) the cancellation of such outstanding Awards in consideration for a payment equal in value to the Fair Market Value of vested Awards, or in the case of an Option, the difference between the Fair Market Value and the exercise price for all shares of Common Stock subject to exercise (*i.e.*, to the extent vested) under any outstanding Option . . . .

JX 1 § 12.3. The Plan defined the "Administrator" as "the Board or the Committee appointed by the Board in accordance with *Section 3.5.*" *Id.* § 2.2. The Plan defined "Fair Market Value" to mean "as of any date, the value of the Common Stock as determined in good faith by the Administrator . . . ." *Id.* § 2.25. Section 12.3 thus contemplated the cancellation of outstanding options in exchange for "the difference between the Fair

34

Market Value and the exercise price for all shares of Common Stock subject to exercise."

It did not contemplate deductions for, among other things, an escrow holdback.

The Plan also contained a section implicated by the Spinoff. Section 12.1 of the Plan stated:

> *Capitalization Adjustments.* If any change is made in the Common Stock subject to the Plan, or subject to any Award, without the receipt of consideration by the Company (through . . . stock dividend . . . or other transaction not involving the receipt of consideration by the Company), then . . . (v) the exercise price of any Option in effect prior to such change shall be proportionately adjusted by the Administrator to reflect any increase or decrease in the number of issued shares of Common Stock or change in the Fair Market Value of such Common Stock resulting from such transaction. . . . The Administrator shall make such adjustments, and its determination shall be final, binding and conclusive.

*Id.* § 12.1. Section 12.1 thus required that the Board account for the Spinoff by adjusting the exercise price of the options to reflect "the change in the Fair Market Value of such Common Stock" resulting from the Spinoff.

During the meeting, PwC presented the preliminary results of its tax transfer valuation. The minutes of the October 5, 2011 meeting reflect that the Board recognized the need to adjust the exercise price of the stock options to reflect the value of the Spinoff. *But the Board never set the adjusted price*. The resolutions adopted at the meeting state:

> **RESOLVED,** that, subject to the consummation of the Distribution [*i.e.,* the Spinoff], the exercise price of each Option shall be proportionately adjusted to take into account the Distribution;, [sic] provided, however, that any fractional shares resulting from the adjustment shall be eliminated[.]

JX 137 at CDX41619. And this makes sense. As part of the compromise with Miraca, the Separation Agreement called for Caris to get a second valuation report from Grant

35

Thornton. It would not have made sense for the Board to adjust the options before that process was complete.

The Board approved the Merger Agreement and the Separation Agreement. The Board expected the Miraca Transaction to close in five to six weeks. Citi discussed next steps with Halbert and Johansen, including a follow-on sale of TargetNow. Citi had already fielded a call from Illumina, who remained interested in purchasing TargetNow. Citi also knew that other participants from the AP business sale process were interested, as well as some potentially new parties. *See* JX 141 & 142.

## K. Martino Determines The Potential Range Of Consideration For Option Holders.

Also on October 5, 2011, the same day as the Board meeting, Martino held an in-person meeting with PwC and Grant Thornton. Before the meeting, Martino emailed PwC about preparing for "the valuation discussions we need to have with Grant Thornton." JX 133. Martino denied giving any instructions to Grant Thornton during the meeting about how they were supposed to proceed. *See* Martino Dep. 212, 221.

After the meeting, Grant Thornton sent Martino a draft engagement letter which contemplated that the firm would determine "the tax basis of the businesses excluded from the Transaction," *i.e.*, TargetNow and Carisome. JX 148 at CDX38291. Grant Thornton had never performed a tax-related valuation for Caris before. A tax transfer valuation was exactly what PwC prepared. Martino struck the words "tax basis" and changed them to "valuation." *Id.* at CDX38283.

On October 6, 2011, the day after the Board meeting, Caris announced the Miraca Transaction. As part of the announcement, Caris sent a list of frequently asked questions to its employees. The FAQs stated that "[a]t the time of closing, an option holder will be entitled to receive a cash amount equal to the difference between (i) the per-share value of the company minus (ii) the per-share exercise price of the option." JX 145 at CDX75816. According to the FAQs,

> [t]he per share price of the Company is expected to be between $5.04-$5.14. This value is made up from the sale of the AP business to Miraca Holdings as well as the value of the Carisome and TargetNow businesses. *The valuation of the separated businesses was based upon a detailed examination of these businesses by two independent and nationally-recognized business valuation firms.*

*Id.* (emphasis added). The italicized portion was not accurate. The valuation was not based on a detailed examination by two firms. Grant Thornton had not yet started work.

The source of the valuation was Martino. On October 6, 2011, before sending out the FAQs, he emailed Halbert and Johansen, proposed "a range of *$5.06 to $5.14 per share*," and asked them to "[l]et [him] know if we can put the range in the [FAQs]." JX 217 (emphasis in original). Johansen suggested that Martino give himself a two cent "cushion" by changing the range to $5.04 to $5.14. *Id.* Halbert said "Ok." *Id.*

Martino's estimate was prescient. One month later, after Grant Thornton completed its report, Martino would set the final option payout at $5.07 per share. The fact that Martino could forecast the range of value so precisely shows how deeply he had his hands in the valuation dough. Grant Thornton supposedly was going to value TargetNow and Carisome independently. Its valuations of those businesses historically

came in higher than the figures PwC had used for tax transfer purposes. Yet Martino accurately foresaw the outcome of the process. Unless Martino told Grant Thornton what he needed during the meeting with PwC on October 5, 2011, he should not have been able to predict where Grant Thornton would end up, particularly since Grant Thornton's report would have to depart from its earlier valuations.

## L.    Grant Thornton's "Independent" Valuation

In theory, Grant Thornton should have been well positioned to prepare a reliable, informed, and independent valuation of TargetNow and Carisome. The firm already had provided Caris with three formal stock option-related valuations in 2011. Grant Thornton also prepared the underlying valuation work for a fourth stock option-related valuation that it sent to Martino but did not finalize. Despite different valuation dates, the inputs were generally consistent. So were the results.

| Exhibit | JX 23 | JX 22 | JX 35 | JX 42 |
|---|---|---|---|---|
| Report Date | 2/11/11 | 2/11/11 | 5/24/11 | 7/13/11 |
| Valuation Date | 3/31/10 | 6/30/10 | 12/31/10 | 3/31/11 |
| TargetNow WACC | 19.2% | 19.3% | 19.3% | 19.1% |
| TargetNow Long Term Growth Rate | 8% | 7% | 7% | 7% |
| TargetNow Capitalization Factor | 9.64x | 8.7x | 8.7x | 8.84x |
| TargetNow Revenue Multiple | 1.9x | 1.6x | 1.4x | 1.0x |
| TargetNow EBITDA Multiple | 6.1x | 6.0x | 6.0x | 6.1x |
| Future TargetNow Enterprise Value | $170,875 | $137,622 | $119,790 | $98,418 |
| Carisome WACC | 24.9% | 25.1% | 24.9% | 24.7% |
| Carisome Long Term Growth Rate | 20% | 20% | 20% | 20% |
| Carisome Capitalization Factor | 24.49% | 23.53% | 24.49% | 25.53% |
| Carisome Revenue Multiple | 1.9x | 3.1x | 3.0x | 3.7x |
| Carisome EBITDA Multiple | 15.4x | 12.2 | 12.2x | 13.3x |
| Future Carisome Enterprise Value | $266,991 | $401,639 | $411,741 | $567,512 |

Grant Thornton's pre-Spinoff valuation conclusions also were consistent in another respect: the relative contributions of TargetNow and Carisome to the aggregate

38

value of Caris. Grant Thornton consistently determined that TargetNow and Carisome contributed at least a third of Caris's total value. Because the following table focuses on relative values, it uses the future, undiscounted values that Grant Thornton calculated.

| Exhibit | JX 23 | JX 22 | JX 35 | JX 42 |
|---|---|---|---|---|
| Report Date | 2/11/11 | 2/11/11 | 5/24/11 | 7/13/11 |
| Valuation Date | 3/31/10 | 6/30/10 | 12/31/10 | 3/31/11 |
| Future AP Business Enterprise Value | $791,260 | $930,328 | $820,857 | $897,016 |
| Future TargetNow Enterprise Value | $170,875 | $137,622 | $119,790 | $98,418 |
| Future Carisome Enterprise Value | $266,911 | $401,639 | $411,741 | $567,512 |
| Combined Future Enterprise Value | $1,229,046 | $1,469,589 | $1,352,388 | $1,562,946 |
| TargetNow and Carisome as % Of Combined Future Enterprise Value | 35.6% | 36.7% | 39.3% | 42.6% |

In addition, to the stock option valuations, Grant Thornton prepared a formal valuation for Caris in 2011 for purposes of Accounting Standard Codification 350. This type of valuation is used to determine whether the value of an asset has been impaired such that its carrying value needs to be reduced. In April 2011, Grant Thornton determined

> the fair value of the invested capital in . . . TargetNow and Pharma (the "TargetNow" reporting unit) . . . as well as the indefinite-lived trade name of TargetNow (the "MPI Trade Name" or the "Trade Name") and database of TargetNow (the "Clinical Database" or "Database"), as of October 1, 2010 (the "Valuation Date").

JX 26 at CDX174770. On its books, Caris was carrying TargetNow's trade name and the clinical database at approximately $1 million each. Caris was carrying the reporting unit, *i.e.,* the business, at $54 million. *Id.* at CDX174771. As with its stock option valuations, Grant Thornton valued TargetNow using management projections, the discounted cash flow method, and comparable company methodologies. For the former, Grant Thornton derived a WACC for TargetNow of 18.7%, used a long term growth rate of 7%, and

39

derived a terminal year capitalization multiple of 8.5x, slightly lower than but generally consistent with the figures used in its stock market valuations. For the latter, Grant Thornton calculated revenue and EBITDA figures, then applied multiples derived from comparable companies. Grant Thornton chose a revenue multiple of 1.5x and an EBITDA multiple of 7.4x, consistent with the multiples used in its stock option valuations. Grant Thornton determined that the fair value of the TargetNow trade name and database were approximately $3 million each. Grant Thornton determined that the fair value of the reporting unit was $88 million. Excluding debt and adding the value of the trade name and database, TargetNow had a value of approximately $104 million. Grant Thornton concluded that no impairment of those assets had occurred.

Then Martino hired Grant Thornton to value TargetNow and Carisome for the Spinoff. One might have thought that Grant Thornton would take positions consistent with its prior work. Instead, after meeting with Martino, Grant Thornton's employees viewed their task as "just copying PwC's report and calling it our own . . . ." JX 150. And that is predominantly what they did.

One example of Grant Thornton's copy job was its valuation of Carisome. Ostensibly to perform their own calculations, the Grant Thornton personnel emailed Caris, referenced a table that PwC included in its report, and asked for "the same source information that PwC had in constructing the table," including "the costs associated with the failed assay." JX 152. Caris responded that it spent $11.623 million on Carisome's first failed product, comprising $7.587 million in 2010 and $4.036 million in 2011. JX

153. Caris also noted that "V1 activities extended only through March 2011, with V2 beginning in April 2011." *Id.* at GT444.

With this information, Grant Thornton supposedly created the following table:

**Carisomes Business Unit Costs Incurred 2008 – 2011 ($000s)**

| Cost | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|
| ITI Purchase Price | 2,154 | - | NA | NA | 2,154 |
| Salaries and Benefits - R&D | - | 872 | NA | NA | 872 |
| Materials - R&D | - | 592 | NA | NA | 592 |
| Outside Counsel Fees | 10 | 251 | NA | NA | 261 |
| Licensing Fees - Louisville | - | 250 | NA | NA | 250 |
| Indirect Costs | - | 1,398 | NA | NA | 1,398 |
| R&D Costs | NA | NA | 1,533 | 8,012 | 9,545 |
| Total | | | | | 15,072 |

JX 168 at CDX38085. The figures in the table matched up exactly with PwC's table.

**Table 1: Total costs associates with the Carisomes Business**

| Cost (USD ,000s) | 2008 | 2009 | 2010 | 2011 | Total |
|---|---|---|---|---|---|
| ITI Purchase Price | $ 2,154 | $ - | N/A | N/A | $ 2,154 |
| Salaries and Benefits – R&D | $ - | $ 872 | N/A | N/A | $ 872 |
| Materials – R&D | $ - | $ 592 | N/A | N/A | $ 592 |
| Outside counsel fees | $ 10 | $ 251 | N/A | N/A | $ 261 |
| Licensing fees - Louisville | $ - | $ 250 | N/A | N/A | $ 250 |
| Indirect Costs | $ - | S 1,398 | N/A | N/A | $ 1,398 |
| R&D Costs[1] | N/A | N/A | $ 1,533 | $ 8,012 | $ 9,545 |
| Total | | | | | $ 15,072 |

JX 116 at CDX59308.

The problem is that PwC prepared its table using different inputs. Caris told PwC to exclude $13.893 million in 2010, not $7.587 million, and to exclude $12.4 million in 2011, not $4.036 million. Martino also told PwC to exclude spending from March 2010 through June 2011, rather than from March 2010 through March 2011. Yet despite receiving different information, Grant Thornton created an identical table. The only

possible explanation is that *Grant Thornton did not prepare its table independently*. It copied PwC's table, just as its employees said they would do.

More fundamentally, Grant Thornton's use of the cost method and its rejection of other valuation methods conflicted with all of its prior valuations. In its valuation for the Spinoff, Grant Thornton opined that "it is not possible to accurately forecast the cash flows of Carisome," and therefore it was necessary to use the cost method rather than the discounted cash flow method or comparable company method. JX 168 at CDX38077-38078. Yet Grant Thornton had relied on management projections and used both the discounted cash flow and comparable company methods when valuing Carisome in all three of the formal valuations that it prepared in 2011, as well as the draft valuation.

When Grant Thornton did not copy directly from PwC, it made significant errors. Most notably, when developing the 2011 revenue figure that Grant Thornton used for valuation purposes, the firm mistakenly used TargetNow's *trailing nine-month revenue for 2010* instead of its *projected twelve-month revenue for 2011*. The erroneous figure was $39.684 million. The accurate figure was $55.052 million. The difference was $15.368 million, *an increase of 39%.*

Not surprisingly, Grant Thornton's valuation for the Spinoff was inconsistent with its prior valuation work. Grant Thornton valued TargetNow at $37.1 million and Carisome at $17.6 million. Using the deal price of $725,000 for the AP business, those values represented 7% of the combined enterprise value for Caris. At trial, Martino acknowledged that Grant Thornton's work was "somewhat flawed." Martino 125.

**M. Martino Recommends And Halbert Approves The Final Value For SpinCo.**

PwC issued its final valuation on November 9, 2011. Its valuation stated that it was an intercompany tax transfer valuation of intellectual property. PwC valued TargetNow's intellectual property at $47.23 million and Carisome's at $17.79 million for total value of $65.02 million.

On November 11, 2011, Martino received the final version of Grant Thornton's report. Grant Thornton valued TargetNow's intellectual property at $37.122 million and Carisome's at $17.634 million for total value of $54.756 million.

Martino forwarded Grant Thornton's report to Halbert and Johansen, noting that Grant Thornton came in lower than PwC:

> Total valuation was determined to be $54.7 million versus the $65 million prepared by PWC. They both valued Carisome at around $17.6 million. The difference in valuation was for the [TargetNow] franchise. I recommend we stay with the $65 million valuation prepared by PWC for transaction purposes.

JX 170. One minute later, Halbert agreed. Martino took that as sufficient. He informed his reports that "[f]or book and tax purposes we are going with the PWC valuation of $65,030,000 as our final valuation." JX 171.

Although the Board had approved the form of the Separation Agreement on October 5, 2011, there were tweaks to the document, and the execution version was dated as of November 16. JX 174. The Separation Agreement provided for the Board to adjust the terms of the options to account for the Spinoff. Section 3.05 of the Separation Agreement stated:

43

> Effective upon the Distribution, the Company shall take all necessary actions pursuant to Section 12.1 of the Company Equity Plan (and the underlying option grant agreements) to proportionately adjust all of the outstanding Company Options to take into account the Distribution; *provided* that any fractional shares resulting from the adjustment shall be eliminated.

SA § 3.05.

On November 21, 2011, the Board approved the Spinoff by unanimous written consent. JX 177. The written consent did not make an adjustment to the outstanding Company Options. The recitals noted the need for an adjustment, and the pertinent resolution stated:

> [E]ffective upon, and subject to, the consummation of the Distribution, each Company Option shall be proportionately adjusted in accordance with Section 12.1 of the Corporation Stock Plan and the underlying option grant agreements to take into account the Distribution . . . .

*Id.* at CDX3996. Like the resolutions on October 5, the Board did not determine how the options would be adjusted. Nor did it determine the Fair Market Value of a share of Caris common stock.

## N.  Martino Sets The Specific Consideration To Be Received By Option Holders.

On November 22, 2011, the Merger closed. That same day, management sent an email to its employees with the subject line "U.S. Stock Option holders update." JX 179. The email stated:

> Effective today, the transaction between Caris Life Sciences and Miraca Holdings, Inc., has legally closed. Based on the final cost of the transaction, the fair market value per share has been set at $5.07.

> As communicated previously in the attached Q&A document, this means each option holder is entitled to receive cash payments equal to the difference between the fair market value per share ($5.07), minus the option

44

> holder's per-share strike/exchange price of the option, multiplied by the number of such stock options granted.
>
> The initial payment distribution, 92 percent of the total payout, is expected to occur within 10 business days, likely Nov. 30. . . . The remaining escrow balance (final 8 percent of the total payout) will be paid (to the extent monies are available) upon the conclusion of the 18-month escrow period . . . .

*Id.* The price of $5.07 disclosed in the email fell precisely within the range of $5.04 to $5.14 that Martino recommended on October 6—ostensibly before he knew the outcome of the Grant Thornton report—and which Johansen and Halbert approved. Of the $5.07, $4.46 represented the value of the AP business. The remaining $0.61 per share represented the value of TargetNow and Carisome.

The November 22 email informed option holders that Caris had withheld 8% of their payment to account for the escrow. Caris told the stockholders the same thing in an email dated December 1, 2011. JX 184. The December 1 email listed the six steps that Caris went through to calculate the option payment. Step 3 stated that Caris had "[m]ultipl[ied] the result of 2 above by .92 (92 percent – rounded), which gives you the amount of initial proceeds you have after deducting the escrow holdback." *Id.* Step 6 stated that "[a]fter 18 months, the remaining escrow amount will be distributed to the extent that the $40,000,000 escrow amount has remaining funds." *Id.*

## O.    This Litigation

The plaintiff is a former salesman in the AP business who owned options to purchase 71,600 shares of Caris common stock. He filed suit alleging that Caris breached the Plan and that the option holders should have received greater consideration. On July

30, 2014, the court certified a class consisting of all holders of stock options pursuant to the Plan whose options were repurchased or cancelled by Caris in connection with the Miraca Transaction, excluding Caris, any current or former director of Caris or SpinCo who was an administrator under the plan, any senior officer of SpinCo, and their associates and affiliates. *See* Pre-Trial Order ¶ 9 (the "Class").

## II.     LEGAL ANALYSIS

The plaintiff contends that Caris breached the Plan in three ways. First, he argues that the Board failed to determine the Fair Market Value of a share of Caris common stock and to adjust the options to account for the Spinoff. Second, he argues that regardless of who determined the amount, it was not a good faith determination of Fair Market Value and resulted from an arbitrary and capricious process. Third, he argues that the Plan did not allow Caris to escrow a portion of the consideration for cancelled options. The plaintiff also advances a claim for breach of the implied covenant of good faith and fair dealing, but because of this decision's disposition of the express contract claims, it does not reach that issue.

A claim for breach of contract has three elements: "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). The first element is undisputed. The Plan is the operative contract. The disputes are over breach and damages.

Analyzing the element of breach requires the application of principles of contract interpretation. The Plan selects Delaware law to govern its terms. JX 1 § 19. When

interpreting a contract governed by Delaware law, "the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006). "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993). The court's role is to "give words their plain meaning unless it appears that the parties intended a special meaning." *Norton v. K-Sea Transp. P'rs L.P.*, 67 A.3d 354, 360 (Del. 2013). When determining the plain or special meaning of a provision, the court "must construe the agreement as a whole, giving effect to all provisions therein." *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985). "Moreover, the meaning which arises from a particular portion of an agreement cannot control the meaning of the entire agreement where such inference runs counter to the agreement's overall scheme or plan." *Id.* "[A] court interpreting any contractual provision . . . must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument." *Elliott Assocs., LP. v. Avatex Corp.*, 715 A.2d 843, 854 (Del. 1998).

## A. The Board Failed To Determine Fair Market Value Or Adjust The Options To Account For The Spinoff.

The plaintiff first argues that Caris breached the Plan because the Board failed to determine the Fair Market Value of a share of Caris common stock and to adjust the options to account for the Spinoff. He contends that Martino determined the value of

47

SpinCo and the amount of consideration that option holders would receive, then Halbert gave perfunctory approval. The plaintiff proved this claim at trial.

As discussed, Section 12.3 of the Plan provides that if the Administrator decides to cancel options in connection with a merger, the option holders are entitled to "the difference between the Fair Market Value and the exercise price for all shares of Common Stock subject to exercise (*i.e.*, to the extent vested) under any outstanding Option . . . ." JX 1 § 12.3(iv). The Plan requires that the Administrator determine Fair Market Value. *Id.* § 2.25. The Administrator is the Board. *Id.* § 2.2.

The Miraca Transaction did not only involve the Merger. It also involved the Spinoff. Section 12.1 of the Plan states that in the event of a transaction like the Spinoff, "the exercise price of any Option in effect prior to such change *shall be proportionately adjusted by the Administrator* to reflect any increase or decrease in the number of issued shares of Common Stock or change in the Fair Market Value of such Common Stock resulting from such transaction . . . ." *Id.* § 12.1(v) (emphasis added).

Under the plain meaning of Section 12.1, the Board was obligated to adjust the terms of the options to reflect the Spinoff. Under the plain meaning of Section 12.3, the Board had discretion as to whether to cancel the options in connection with the Merger, but if it did, then the option holders were entitled to receive "the difference between the Fair Market Value and the exercise price for all shares of Common Stock subject to exercise." The Plan imposed on the Board the obligation to determine the Fair Market Value of a share of common stock.

The parties have stipulated that the "entire Board of Directors served as the Administrator under the Plan for purposes of the Option Transaction." Pre-Trial Order ¶ 26. The Administrator was not one or two directors acting informally. Nor was it an officer getting approval from the controlling stockholder.

Valid board action requires that the directors act at a properly convened meeting or unanimously by written consent. *See* 8 *Del. C.* § 141. "Only the duly authorized board has the power to act for the corporation, and all members of the corporation's board must be given an opportunity to participate meaningfully in board meetings." *Grayson v. Imagination Station, Inc.*, 2010 WL 3221951, at *5 (Del. Ch. Aug. 16, 2010).

Under the Plan, the Board could have delegated its authority as Administrator to a committee made up of directors. Section 3.5 of the Plan authorized the Board to "delegate administration of the Plan to a Committee or Committees of one or more members of the Board," in which case "the Committee shall have, in connection with the administration of the Plan, the powers theretofore possessed by the Board . . . ." JX 1 § 3.5(a). The Board could have empowered Halbert as a one-person committee. It didn't.

The trial record established that Martino determined the value that option holders would receive. Halbert signed off on Martino's determination, and Halbert and Johansen were the only directors who had any input in the process. On October 6, 2011, when they picked the range of $5.04 to $5.14, they only had seen PwC's draft report. On November 11, Martino sent them Grant Thornton's report and recommended that "we stay with the $65 million valuation prepared by PWC . . . ." JX 170. Martino's use of the term "we" illustrated who the decision makers were. One minute later, Halbert gave his consent.

Johansen did not reply. Martino treated Halbert's signoff as sufficient. That was the extent of the determination for both the Fair Market Value of a share of common stock *and* the adjustment of the stock options for purposes of the Spinoff.

Other evidence confirms that the Board never determined Fair Market Value. Knowles, a Vice Chairman of the Board, did not know that the Plan existed. He did not know that the Board was the Administrator or that the Plan required the Board to act. He could not recall any Board discussions about fair market value, any vote on the options, or any determination of what the option holders ultimately received. *See* Knowles 485-87; Knowles Dep. 106-13.

What Knowles instead believed was that the Board simply advised Halbert who, as Caris's controlling stockholder, CEO, and Chairman, had the final say on all decisions. Knowles testified, "[I]t's clear that what – that David will – that the majority shareholder, the president and CEO, will and does take into account feedback and input. However, ultimately he will make the decision." Knowles 481; Knowles Dep. 42 ("[U]ltimately, either in the meeting or outside the meeting, then it is David's right to make the decision. We [the Board] respect that.").

Although some controllers and boards may act this way, Section 141(a) of the Delaware General Corporation Law (the "DGCL") establishes "the bedrock statutory principle of director primacy." *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *9 (Del. Ch. Nov. 7, 2013). "[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present." *In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2291842, at *15 (Del. Ch. May 25, 2010).

50

The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. That the majority of a company's voting power is concentrated in one stockholder does not mean that that stockholder must be given a veto over board decisions when such a veto would not also be afforded to dispersed stockholders who collectively own a majority of the votes. Like other stockholders, a controlling stockholder must live with the informed (i.e., sufficiently careful) and good faith (i.e., loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.

*Hollinger Inc. v. Hollinger Int'l, Inc. (Hollinger II),* 858 A.2d 342, 387 (Del. Ch. 2004) (Strine, V.C.), *appeal refused*, 2004 WL 1732185, at *1 (Del. July 29, 2004) (TABLE).

Caris has argued that the entire Board, including Knowles, really did determine Fair Market Value and make the necessary adjustments on October 5, 2011, when they approved the Merger Agreement. They did not. Consistent with Knowles's testimony, the minutes of the Board meeting reflect only that the Board noted the need for an adjustment. The resolution did not make an adjustment or determine Fair Market Value. It stated:

> **RESOLVED,** that, subject to the consummation of the Distribution [*i.e., the Spinoff*], the exercise price of each Option shall be proportionately adjusted to take into account the Distribution;, [sic] provided, however, that any fractional shares resulting from the adjustment shall be eliminated[.]

JX 137 at CDX41619. The Board just as easily could have passed a resolution saying "the Company shall be in compliance with all of its contractual commitments." Passing such a resolution would not make it so.

The same thing happened on November 21, 2011, when the Board approved the Spinoff by unanimous written consent. JX 177. The written consent did not determine

Fair Market Value or make an adjustment to the options. As on October 5, the recitals noted the need for an adjustment, and the pertinent resolution stated:

> [E]ffective upon, and subject to, the consummation of the Distribution, each Company Option shall be proportionately adjusted in accordance with Section 12.1 of the Corporation Stock Plan and the underlying option grant agreements to take into account the Distribution . . . .

*Id.* at CDX3996. The Board did not state what the adjustments were, nor did it determine Fair Market Value.

Because the Board did not act as the Administrator to set the value that holders of options would receive, Caris breached the Plan.

## B. The Valuation Determination Was Not Made In Good Faith And Was Arbitrary And Capricious.

The plaintiff next contends that irrespective of who determined what option holders would receive, it was not made in good faith. As noted, the Plan defines Fair Market Value as a value "determined in good faith by the Administrator . . . ." JX 1 § 2.25. The Plan also provides that "[a]ll decisions made by the Administrator pursuant to the provisions of the Plan shall be final and binding on the Company and the Participants, unless such decisions are determined to be arbitrary and capricious." *Id.* § 3.4.

In its post-trial brief, Caris treated both provisions as if they established standards of review. Caris then argued that the good faith standard is a more specific provision that applies to the determination of Fair Market Value, while the arbitrary and capricious

standard is a more general standard that applies to "[a]ll decisions made by the Administrator." According to Caris, the more specific good faith standard controls.[12]

In my view, the Plan read as a whole supports a different construction in which both standards work together without conflict. First, under the good faith standard, the Administrator must believe subjectively in the Fair Market Value it has selected. Second, the decision reached must result from a process and fall within a range of outcomes that is not "arbitrary and capricious." Under this two part test, a Board could believe subjectively in the Fair Market Value it selected, and yet a reviewing court could determine nevertheless that the result was arbitrary and capricious. This reading gives "each provision and term effect, so as not to render any part of the contract mere surplusage." *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010).

---

[12] In its pre-trial brief, Caris appeared to accept that both contractual standards could apply. *See* Dkt. 72 at 3 ("Thus, Plaintiff's claim fails unless he is able to establish that the Board acted either in bad faith or arbitrarily and capriciously in determining the Fair Market Value of the underlying common stock."). In its post-trial brief, Caris claimed the plaintiff had never before argued that the determination of Fair Market Value was arbitrary and capricious. Dkt. 105 at 35-36. Actually, his complaint made that allegation, and Caris devoted large portions of its pre-trial brief to addressing it. *See* Dkt. 10 ¶¶ 7, 58; Dkt. 72 at 3, 30-34. Caris likewise asserted that the plaintiff cited the implied covenant in its post-trial brief "*for the first time in these proceedings . . . .*" Dkt. 105 at 41 (emphasis in original). Yet the complaint had cited the implied covenant, as did the pre-trial order. *See* Dkt. 10 ¶ 117, Dkt. 91 ¶ 7. And Caris said that the complaint omitted any claim for breach of the Plan based on by escrowing a portion of the option proceeds. In truth, it was there. *See* Dkt. 10 ¶ 116 ("Additionally, in exercising its repurchase right under the Plan, Defendant improperly withheld approximately eight percent (8%) of the price paid to repurchase the option holders' options."). Caris's contention that the plaintiff waived each of these arguments was not well founded.

**1.     The Valuation Determination Was Not Made In Good Faith.**

The plaintiff contends that the determination of what the option holders received could not have been reached in good faith. The plaintiff proved this contention at trial.

When a contract governed by Delaware law calls upon a party to act or make a determination in good faith, without any qualifier, it means that the party must act in subjective good faith.[13] Under a subjective good faith standard, "the ultimate inquiry must focus on the subjective belief of the [party] accused of wrongful conduct." *Encore Energy*, 72 A.3d at 107. The Delaware Supreme Court has admonished that when applying the subjective belief standard, "[t]rial judges should avoid replacing the actual [decision-makers] with hypothetical reasonable people . . . ." *Id*. Nevertheless, objective facts remain logically and legally relevant, because "objective factors may inform an analysis of a defendant's subjective belief to the extent they bear on the defendant's credibility when asserting that belief." *Id.* When witnesses have testified that they believed subjectively in what the contract required, the trial judge must "make credibility determinations about [each] defendant's subjective beliefs by weighing witness testimony against objective facts." *Id.* at 106. The credibility determination turns in part on "the demeanor of the witnesses whose states of mind are at issue . . . ." *Johnson v. Shapiro*, 2002 WL 31438477, at *4 (Del. Ch. Oct. 18, 2002).

---

[13] *ev3, Inc. v. Lesh*, 114 A.3d 527, 539 (Del. 2014) (Strine, C.J.); *DV Realty Advisors LLC v. Policeman's Annuity & Benefit Fund of Chi.*, 75 A.3d 101, 110 (Del. 2013); *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 104 (Del. 2013).

The Plan called upon the Board to determine Fair Market Value in good faith and to adjust the options to reflect the Spinoff. Because the Board did not act, the good faith standard arguably does not even apply. Assuming it does, it is not immediately clear to whom it should be applied. In this case, Martino actually made the determination, and Halbert signed off, so this decision analyzes whether they acted in subjective good faith. The operative question is whether the $65 million value they placed on SpinCo reflected their subjective belief about the value of TargetNow and Carisome. It did not.

### a. Evidence Of Subjective Belief

Martino and Halbert did not believe that TargetNow was worth only $47 million. The first indication is Martino's estimate in April 2011, provided in response to a question from PwC. Martino told PwC that TargetNow was worth between $150 million and $300 million. His figure matched up with Citi's estimate in May 2011 that the value of TargetNow was $195 to $300 million.

During the bidding process for the AP business, Caris received strong indications of interest in TargetNow from multiple bidders. Five of the strategic buyers expressed interest in TargetNow. Although Caris instructed the bidders not to provide price indications and to wait until after the sale of the AP business, Danaher expressed interest in acquiring both the AP business and TargetNow for $825 to $900 million. Assuming Danaher valued the AP business at Miraca's market-clearing price of $725 million, the bid implied a value of $100 to $175 million for TargetNow. Danaher later declined to bid on the AP business but stated that it still wanted to bid on TargetNow, implying that it placed less value on the former and more on the latter. After the AP business was sold,

55

Illumina told Caris that it remained "very interested in TargetNow." JX 180. Danaher and others, including Leica Microsystems, also remained interested. *See* JX 181; JX 186; JX 196; JX 197; JX 198; JX 199. Multiple documents indicate that as a result of the information gained through the sale of AP business, Citi believed and was advising Caris that TargetNow could sell for around $200 million. Martino was the point person for Caris, and Halbert was kept informed throughout the process. Both knew about the indications of value that the market was providing.

In addition, there were the valuations that Grant Thornton prepared in the ordinary course. During 2011, Martino received three final reports and one draft report for use in valuing stock options, and a valuation report for purposes of ASC 350 impairment analysis. The ASC 350 report was the most thorough. It valued TargetNow's business, trade name, and database on a debt free basis at $104 million. *See* JX 26.

There was also TargetNow's performance since Caris had bought it. Three years earlier, Caris paid $40 million for TargetNow when it was generating approximately $1 million in annual revenue. Caris grew TargetNow's annual revenue to approximately $50 million. During the sale process for the AP business, Caris made presentations to bidders that highlighted the increase and included bullish projections. It defies belief that Martino and Halbert thought TargetNow's value had increased by only 17% when Caris had grown its revenue by 5,000%.

Martino and Halbert likewise did not believe that Carisome was only worth $17.79 million. They thought it was worth at least as much as TargetNow. Placing an actual value on Carisome was extremely difficult because if it succeeded, the company would

be worth billions, but if it failed, it would be worth nothing. Martino and Halbert understood the risk. They thought Carisome could succeed.

One source of evidence is the Miraca Transaction itself. Although Halbert and Fund VI were happy to take some profits, the other major purpose of the sale was to provide ongoing funding for Carisome. TargetNow appeared to be on the verge of achieving profitability. Halbert and Fund VI reinvested $100 million of the Merger proceeds in SpinCo to fund Carisome. It was an early-stage investment in a promising technology, but the size of the investment indicates their confidence in the project. Consistent with their bullish view, Halbert and other members of management spoke glowingly and optimistically about Carisome's prospects.[14] Post-closing presentations to the Board contemplated expanding Carisome with particular emphasis on its sales function. JX 182. Management and the Board actually believed at the time that Carisome could have a product to launch in early 2012. *Id.*

Here too, Grant Thornton provided stock option valuations in the ordinary course of business. The three final and one draft reports valued Carisome at $267 million (JX 23), $402 million (JX 22), $412 million (JX 35), and $568 million (JX 42). Those were

---

[14] *See* JX 173 (Halbert email regarding closing: "Thank you all for all of your hard and good work getting this very important transaction completed!! Now its [sic] on to Carisome!! And transforming the world!!!!"); JX 163 (Johansen email to Halbert regarding future plans for SpinCo: "As we think about SpinCo as a juggernaut developing and rolling out Carisome diagnostic tests over the next few years (and beyond!), we would really like to get your candid feedback on how you think the organization should ideally be designed and function.").

future valuations. The discounted figures were $116 million (JX 23), $147 million (JX 22), $169 million (JX 35), and $199 million (JX 42).

Some of the most probative evidence comes from the files of JH Whitney, a sophisticated private equity firm whose representative, Castleman, served on the Board. On November 3, 2011, JH Whitney gave a presentation to the advisory board of Fund VI in which it valued Fund VI's 26.7% of TargetNow at $41 million, implying a value for the whole business of $153.5 million. JX 161 at JHW884. In a presentation to investors in Fund VI at its annual meeting, JH Whitney reported that Caris had a "[s]igned purchase agreement to sell [the] lab business" that would generate approximately $120 million for Fund VI and was "[e]xpecting [a] sale of Caris TargetNow to generate another $50mm+ in six to nine months[.]" JX 162 at JHW886. Because Fund VI owned 26.7% of SpinCo, that estimate implied a value for TargetNow of approximately $187.2 million. *Id.* The presentation provided the following additional information:

- TargetNow is run-rating $60mm+ revenue

  - Attracted buyer interest during sale process of AP business

  - Expect sale in six to nine months

*Id.* at JHW890. Other JH Whitney documents from the same period contained similar assessments.[15]

---

[15] *See* JX 191 (estimating that equity value of SpinCo was $159.8 million, approximately 119% higher than the figure Fund VI was carrying on its financial statements, which was $141.6 million); JX 193 at JHW880 ("TargetNow, the molecular profiling business, is run-rating at over $60mm of revenue. The Company's current expectation is to explore selling this asset in the next six to nine months."); JX 195

The JH Whitney documents were understandably more vague about the value of Carisome, because there was far less certainty about its prospects. But they expressed significant optimism. The annual meeting presentation described Carisome as a "highly valuable molecular diagnostics business[.]" JX 162 at JHW886. It also stated that there was "[c]ontinued momentum towards Carisome platform commercialization[.]" *Id.* at JHW890. The "Final Valuation Summary" stated that Carisome was "well capitalized to get to . . . commercialization of [a] blood test for cancer[.]" JX 191 at JHW873. JH Whitney's year-end summary to Fund VI investors stated that

> Carisome, Caris's molecular diagnostics business, continues to be a work in process with tremendous upside potential. The Company is continuing to invest aggressively in the Carisome platform with the expectation that it will have a blood based test for cancer on the market by the end of the year.

JX 193 at JHW880. These documents reinforce my belief that Carisome was regarded as at least as valuable as TargetNow.

Given this powerful evidence, it is impossible to credit that Martino and Halbert actually believed in November 2011 that the value of TargetNow was only $47.23 million and that the value of Carisome was only $17.79 million. They subjectively believed that both were worth much more.

### b. Evidence Of *Scienter*

---

(placing enterprise value of SpinCo at $179.2 million). At trial, Castleman disavowed the contemporaneous documents and testified directly contrary to them. He claimed that he "did not think TargetNow could be sold" and that Carisome was "ten years or 20 years" from commercialization. Castleman 507, 518-19. I credit the contemporaneous documents.

In addition to the evidence of what Martino and Halbert actually believed, there is persuasive evidence that Martino manipulated the valuation process. Also relevant to their credibility is Martino and Halbert's testimony that they had no problem giving false projections to bidders. These actions support a finding of subjective bad faith.

For the Miraca Transaction to be close, it was critical that Caris address the tax issue. The goal was a valuation that would result in zero corporate level tax, and Martino made sure to get there. Initially he pointed PwC to the figure that they needed to reach by asking the firm to "prepare something in draft based on a 40 million or so valuation . . . ." JX 96. At the same time, he provided PwC with reduced forecasts for TargetNow. PwC used the projections to deliver the "zero tax" result that its client wanted. JX 99. A day later, they sent an even lower valuation that achieved the client's desire for something around "40 million or so." JX 100.

Martino claimed in his deposition and at trial that the projections he prepared on the morning of September 20, 2011, and sent to PwC were the Company's "official projections" and reflected his "best estimate of what the future would hold . . . ." Martino Dep. 110; *see* Martino 180-82. I do not credit that testimony, which was contrary to the contemporaneous evidence and seemed crafted to parrot a legal standard. Martino also testified that the goal of the valuation exercise was not to minimize taxes in connection with the Spinoff but rather to "come up with . . . the best estimate of the value of the business based upon . . . how the business is going to perform." Martino Dep. 145; *see* Martino 182-83. I do not credit that testimony either.

After obtaining the zero-tax answer he wanted, Martino manufactured support for PwC's suppressed valuation. When a member of the PwC team questioned the difference between the tax basis for the holding company and the tax basis valuation for Carisome, Martino instructed PwC that it could exclude R&D spending by Carisome from March 2010 to June 2011. When Deloitte questioned PwC's valuation and suggested that Clarient was a comparable company, Martino drafted a memorandum asserting that it was not. JX 118. Yet Caris had identified Clarient as a competitor in Board presentations, Citi had pointed Illumina to the Clarient transaction as a comparable, and after GE Healthcare bought Clarient, Halbert and Citi had invited GE to visit Caris to show them that TargetNow was a superior offering that GE should purchase. Moreover, at the same time Martino took the position that Clarient was not comparable in his memorandum for Deloitte, he prepared a memorandum for PwC in which he justified his cuts to the projections based in part on "formidable" competition from Clarient, which he described as having a "TargetNow like offering." JX 116. And on the bigger question of whether TargetNow could be valued using comparable companies, Grant Thornton had done so in two valuation reports in February 2011 (JX 22 & JX 23), another report in April (JX 26), another in May (JX 35), and a draft report in July (JX 42). JH Whitney also valued TargetNow using comparable companies. *See* JX 191 at JHW875.

Martino showed a similar lack of candor when Miraca's outside counsel expressed concern about the valuation of TargetNow and Carisome and asked for information about the lowered projections. Martino responded that "[t]he projections have been reviewed and approved by David [Halbert] and JH Whitney. All the information we have has been

provided to Deloitte via the PWC valuation." JX 126. Those statements do not appear to be accurate. The metadata from the file shows that Martino created them on the morning of September 20, 2011, then emailed them to PwC at 8:35 a.m. The only projections that the Board reviewed for TargetNow were the materially higher bidder projections.

Despite its concerns about PwC's valuation work, Miraca and Caris ultimately compromised on an indemnification letter and a second opinion from Grant Thornton. At that point, Martino intervened again. Rather than leaving Grant Thornton to its own devices, he made sure Grant Thornton reached the right result. He arranged a meeting with Grant Thornton and PwC before Grant Thornton started work, and he communicated with PwC before the meeting about what they needed to tell Grant Thornton. Regardless of what was claimed, Grant Thornton clearly understood the task it was assigned, because the draft engagement letter that Grant Thornton sent Martino called for a "tax basis" determination. JX 148 at CDX38291. Grant Thornton's employees got the message as well: they correctly understood their task as "just copying PwC's report and calling it our own . . . ." JX 150. In support of that effort, Grant Thornton abandoned its historical methods of valuation and tracked PwC's report.

Although Martino claimed at trial that he did not manipulate the projections, he testified that he was willing to provide false projections for other purposes. During the sale process for the AP business, Caris provided bidders with projections for TargetNow. Martino and his team prepared them, and the full Board reviewed them. The projections were materially higher than what Sawyers sent to PwC in August 2011, and the plaintiff and his expert sought to rely on them when valuing TargetNow.

62

Martino and Halbert responded by testifying that they engaged in fraud. Martino averred that "at the time," he did not believe "at all" that it was possible for TargetNow to achieve the numbers in "any of the forecasts." Martino 165. Halbert stated in his deposition that when Caris provided the TargetNow projections to bidders, he believed they were a "fantasy land," "an impossibility," and "intentionally exaggerated." Halbert Dep., II 21. Counsel followed up:

> Q. So you'd be willing to provide information that you believed was impossible as long as . . . the buyer believed it?
>
> A. That's correct.
>
> * * *
>
> Q. But at least as far as the value-based pricing goes, you think these were false at the time they were created?
>
> A. They were fantasy.

*Id.* at 22-23.

During a sales process, a company may provide optimistic or bullish projections to bidders, even "extremely optimistic valuation scenarios for potential buyers in order to induce favorable bids."[16] There is an important line, however, between responsibly aggressive projections and outright falsehoods: "Pushing an optimistic scenario on a potential buyer is to be expected; shoveling pure blarney at that stage is another."

---

[16] *In re Pennaco Energy, Inc.*, 787 A.2d 691, 713 (Del. Ch. 2001) (Strine, V.C.) (citations and internal quotation marks omitted); *see also In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (Strine, V.C.) ("[O]ne of the tasks of a diligent sell-side advisor is to present a responsibly aggressive set of future assumptions to buyers, in order to extract high bids.").

*Pennaco Energy*, 787 A.2d at 713. "An optimistic prediction regarding a company's future prospects" may rise to the level of a "falsehood" if accompanied by "evidence that it was not made in good faith (i.e., not genuinely believed to be true) or that there was no reasonable foundation for the prediction."[17]

By testifying that they knowingly provided projections to bidders that they did not believe to be true, Martino and Halbert entangled themselves in a double-liar problem. They asked me to believe them now that they were lying then. *See Atr-Kim Eng Fin. Corp. v. Araneta*, 2006 WL 4782272, at \*7, \*17 (Del. Ch. Dec. 21, 2006) (Strine, V.C.) (rejecting a "believe-me-now-I-was-lying-then" explanation). My sense is that in reality,

---

[17] *Hubbard v. Hibbard Brown & Co.*, 633 A.2d 345, 350 (Del. 1993); *accord Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985) ("[A]n opinion must not be made 'with reckless disregard for its truth or falsity,' or with a lack of a 'genuine belief that the information disclosed was accurate and complete in all material respects.'" (quoting *McLean v. Alexander*, 599 F.2d 1190, 1198 (3d Cir. 1979))); *see, e.g., Osram Sylvania Inc. v. Townsend Ventures, LLC,* 2013 WL 6199554, at \*13 (Del. Ch. Nov. 19, 2013) (finding that the buyer under an agreement to purchase the remaining capital stock of a company had a viable fraud claim against the seller by pleading that the seller "intentionally inflated the sales figures, and otherwise manipulated the financial statements, for Second Quarter 2011 to make it appear as though the Company had met its forecasts and was more successful than it actually was"); *Abry P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1051 (Del. Ch. 2006) (Strine, V.C.) (declining to dismiss a fraud claim in which the purchaser of a company alleged that the company intentionally manipulated its financial statements to induce the buyer into purchasing the company at an excessive price); *Cobalt Operating, LLC v. James Crystal Enters., LLC*, 2007 WL 2142926, at \*27 (Del. Ch. July 20, 2007) (Strine, V.C.), *aff'd*, 945 A.2d 594 (Del. 2008) (ruling that purchaser of radio station established the elements of common law fraud by showing that the seller intentionally provided the purchaser with false financial information that overstated the station's annual cash flow); *see also Miramar Firefighters Pension Fund v. AboveNet, Inc.*, 2013 WL 4033905, at \*8 (Del. Ch. July 31, 2013) (finding that "alleged modifications to projections were not so far beyond the bounds of reasonable judgment that the Board had to have known that the inputs were inaccurate or that the use of such inputs was inexplicable on any ground other than bad faith").

the bidder projections were aggressive but provided in good faith. I further suspect that if Martino and Halbert had to face a fraud claim, that is what they would say. But that only creates a different credibility problem: their willingness to say what they believed would help them in this litigation, regardless of whether it was actually true.

Martino suppressed the valuation of SpinCo to achieve zero tax. Halbert approved it. The value of SpinCo was not determined in good faith.

### 2. The Valuation Determination Was Arbitrary And Capricious.

Assuming for purposes of analysis that Martino and Halbert did believe subjectively in the valuation they selected, the process they followed was nonetheless arbitrary and capricious. Although the Plan does not define this standard, a well-developed body of law exists applying it in the context of decisions by administrative agencies. Under the federal Administrative Procedures Act, a court reviewing agency action "shall hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The United States Supreme Court has emphasized that "the scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

"Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts

found and the choice made.'" *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). A court may find agency action to have been arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id.* "The reviewing court should not attempt itself to make up for such deficiencies: 'We may not supply a reasoned basis for the agency's action that the agency itself has not given.'" *Id.* (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

Delaware courts have explained the "arbitrary and capricious" standard in similar terms. This court has described as "arbitrary and capricious" action which is "unreasonable or irrational, or . . . that which is unconsidered or which is wilful and not the result of a winnowing or sifting process." *Willdel Realty, Inc. v. New Castle Cnty.*, 270 A.2d 174, 178 (Del. Ch. 1970), *aff'd*, 281 A.2d 612 (Del. 1971). The concept refers to action taken "without consideration of and in disregard of the facts and circumstances of the case." *Id.* "Action is also said to be arbitrary and capricious if it is whimsical or fickle, or not done according to reason; that is, it depends upon the will alone." *Id.*

This court has explained that an agency has satisfied the arbitrary and capricious standard when it has "a decision-making process rationally designed to uncover and address the available facts and evidence that bear materially upon the issue being decided." *Harmony Constr., Inc. v. State Dep't of Transp.*, 668 A.2d 746, 751 (Del. Ch. 1995). The standard of review "clearly is deferential, and its function is similar to that

66

performed by the business judgment standard for reviewing decisions of corporate boards of directors." *Id.* "The purpose of both review standards is to prevent 'second guessing' by courts of decisions that properly fall within the competence of a governmental (or corporate) decision-making body, so long as those decisions rest upon sufficient evidence and are made in good faith, disinterestedly, and with appropriate due care." *Id.* As such, arbitrary and capricious review is predominantly process-based. The reviewing court should consider the adequacy of (i) "the evidence considered by the [decision-maker]" and (ii) "the process by which the relevant evidence and facts were obtained." *Id.* at 750. A decision can fall short under this standard if the decision-maker relied "solely upon selected facts or evidence that would support one particular outcome while at the same time blinding itself—or refusing to inquire into—material facts or evidence that might compel an opposite outcome." *Id.*

### a. Martino Set Out To Achieve Zero Tax.

The determination of the consideration that option holders received was arbitrary and capricious because it was not the result of a process "designed to uncover and address the available facts and evidence that bear materially upon the issue being decided." *Harmony Constr.,* 668 A.2d at 751. As discussed previously, Martino set out to achieve zero tax, and he succeeded in that goal.

### b. The Use Of A Transfer Tax Valuation

The determination of the consideration that option holders received was also arbitrary and capricious because Martino relied on a valuation prepared for a different purpose. PwC did not determine the Fair Market Value of a share of common stock of

67

SpinCo. As its engagement letter stated, PwC prepared a tax transfer valuation of TargetNow and Carisome's intellectual property. JX 80. PwC's lead relationship partner testified that the only valuations PwC ever performed for Caris were transfer pricing valuations. Moore Dep. 31-32. The parties stipulated in the pretrial order that PwC's final report "was completed for the purpose of determining intercompany transfer tax liability under U.S. Internal Revenue Code §482 and the Treasury Regulation promulgated thereunder . . . ." Pre-Trial Order ¶ 40. That section addresses the transfer of intangible property between related parties.

PwC warned that its tax transfer valuation "may not equate to the definition of fair market value under Revenue Ruling 59-60, or to the concept of fair value in a financial reporting context."[18] When PwC conducted its Section 482 valuation, it applied what is known as the arm's length method. This method "seeks to ascertain the prices that would be charged in transactions between related parties if they were independent entities dealing at arm's length and then to determine tax consequences as if those arm's-length prices had been used by the related parties." J. Clifton Fleming, Jr. & Robert J. Peroni, *A Hitchhiker's Guide to Outbound International Tax Reform*, 18 Chap. L. Rev. 133, 146 n.41 (2014). But the arm's length method omits certain assets, including goodwill. "Goodwill is not an intangible asset subject to the Section 482 Regulations regarding

_____

[18] JX 119 at CDX3094. Revenue Ruling 59-60 sets forth the "methods, and factors which must be considered in valuing . . . . corporate stocks on which market quotations are either unavailable or are of such scarcity that they do not reflect the fair market value." Rev. Rul. 59-60, 1959-1 C.B. 237 (1959).

international transfers between controlled taxpayers." Robert F. Reilly, *Goodwill Valuation Approaches and Methods*, 94 PRACTXST 65, 66 (2015). By omitting goodwill, a tax transfer valuation does not value the business as a going concern.

For TargetNow and Carisome, the difference between a tax transfer valuation and a fair market valuation was substantial. The differential can be seen by comparing competing valuations that PwC and Grant Thornton prepared with a valuation date of March 31, 2010. PwC provided its valuation to support the transfer of Carisome's intellectual property to a Gibraltar-domiciled subsidiary. Using the cost-basis method, PwC valued Carisome's intellectual property at $10.25 million. JX 12 at CDX34388; JX 14. Meanwhile, Grant Thornton prepared its valuation for tax and financial reporting in connection with stock options.[19] Grant Thornton concluded that the value of the Carisome business as of December 31, 2013, would be $266,991,000. After discounting that value back to the March 31, 2010, valuation date, Grant Thornton's report assigned Carisome a value of $115,981,000—*fifteen times higher* than what PwC derived using the cost-basis method.[20]

---

[19] Grant Thornton actually prepared two valuations with a valuation date as of March 31, 2010. The firm initially prepared a draft valuation dated June 23, 2010. JX 13. Grant Thornton later finalized its valuation in a report dated February 11, 2011. JX 23.

[20] JX 22. Grant Thornton calculated a base case value of $226,614,000, an upside case value of $388,123,000, and a downside case value of $24,750,000. For its fair market value determination, Grant Thornton used a 50% weighting for the base case and a 25% weighting for the other two cases. These figures are from the final report dated February 11, 2011.

At trial, the defense witnesses claimed not to have understood the nature of PwC's valuation. That may be true, but it is also another strike against Caris under the arbitrary and capricious standard. "When an agency makes a factual mistake because it relied on incorrect information, it cannot be said to have made a rational decision." *Prison Health Servs., Inc. v. State*, 1993 WL 257409, at *3 (Del. Ch. June 29, 1993). Relying on a transfer tax valuation of intellectual property to determine the fair market value of a business was arbitrary and capricious.

### 3. The Grant Thornton Report

The Grant Thornton report deserves separate mention because its contents were so flawed as to support both an inference of bad faith and a finding the process was arbitrary and capricious. Previous Delaware decisions have criticized erroneous or seemingly motivated analyses by financial advisors,[21] but the Grant Thornton report reached a new low. As Grant Thornton's employees recognized, they were "just copying PwC's report and calling it [their] own . . . ." JX 150. The copy job was so blatant that the output matched PwC's, even when the inputs differed. And when Grant Thornton did its own

---

[21] *See, e.g.*, *El Paso*, 41 A.3d at 441 (noting "questionable aspects to Goldman [Sachs]'s valuation of the spin-off"); *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 771-73, 803-804 (Del. Ch. 2011) (Strine, C.) (critiquing misleading analyses performed by Goldman Sachs); *In re Loral Space & Commc'ns Inc.*, 2008 WL 4293781, at *10-11, *14-15 (Del. Ch. Sept. 19, 2008) (Strine, V.C.) (critiquing misleading presentation by North Point Advisors); *Robert M. Bass Gp., Inc. v. Evans*, 552 A.2d 1227, 1245 (Del. Ch. 1988) (critiquing misleading analyses performed by Lazard and noting "at least one assumption that is incorrect, and upon others that are highly questionable").

work, it made fatal errors, such as using the materially lower figure for nine-month trailing revenue rather than twelve-month projected revenue.

Grant Thornton was capable of valuing TargetNow and Carisome as going concerns. Grant Thornton did so in 2011 three times formally and one time in draft. Grant Thornton also prepared a formal valuation for an ASC 350 impairment analysis. Each time, Grant Thornton used management projections and a combination of the DCF and comparable company methods. Each time, Grant Thornton valued TargetNow and Carisome at multiples of the value it reached for the Spinoff. For the Spinoff, Grant Thornton abandoned its prior methodologies and reached a valuation so much lower as to be itself suggestive of bad faith.

At trial, the defense witnesses wisely tried to distance themselves from Grant Thornton's work by conceding that it was flawed and arguing that no one relied on it. But the report nevertheless reflects on the integrity of the process. It is an example of action "so egregiously unreasonable" as to be "essentially inexplicable on any ground other than subjective bad faith." *Encore Energy*, 72 A.3d at 107 (alterations and internal quotation marks omitted).

## C. Caris Breached The Plan By Retaining A Portion Of The Consideration In Escrow.

As his third claim of breach, the plaintiff argues that Caris breached the Plan by withholding a portion of the merger consideration to fund the option holders' proportionate share of the escrow fund. Caris has responded that it did what the Merger

Agreement required. Unfortunately for Caris, the Plan governs the options, not the Merger Agreement.

As a threshold matter, it is undisputed that some amount was withheld and placed in escrow. Until the post-trial hearing, it appeared that the parties agreed as to both the fact and the amount. The parties stipulated in the pretrial order that

> [t]he initial cash payment to each option holder in connection with the Option Transaction was equal to (A) the difference between (i) $5.07 per share minus (ii) the applicable per share exercise price of such option holder's options, multiplied by (B) the number of stock options granted, minus (C) 8% of the cash payment to such option holder to be placed into the holdback escrow account, minus (D) the amount of federal tax, state income tax (where applicable) and payroll tax withheld.

Pre-Trial Order ¶ 19. The parties also stipulated that

> [t]he aggregate cash payment to the option holders, in connection with the Option Transaction, without regard of [sic] the escrow holdback or tax withholdings, was approximately $22,520,414. After taking into account the 8% escrow holdback, the aggregate cash payment to such option holders was approximately $20,713,012.

*Id.* ¶ 20. Taken together, these facts established that the gross payment was $22,520,414, that the payment net of the escrow holdback was $20,713,012, and therefore that the amount deducted from the option payout and kept in escrow was $1,807,402.

These stipulations left the court to decide a question of law: did the Plan permit Caris to withhold a portion of the consideration due to the option holders? Yet in their post-trial brief, the defendants objected vociferously, claiming that Caris

> did not withhold 8% of option holders' $5.07 consideration (less strike price) and 8% of New Caris stockholders' $4.46 consideration. Instead, it withheld $40 million, as required by Section 2.10(b)(i) [sic] the Merger Agreement (JX144), which accounted for approximately 8% of the total proceeds due to stockholders and option holders from the sale of the AP

72

Business. *See* JX167; JX136 at 2. In other words, approximately 8% of $4.46 was withheld from both option holders and stockholders.

Dkt. 105 at 39-40. Caris contended that there were documents in the discovery record to support its assertion, but that those documents had not been introduced at trial because "Plaintiff made a tactical decision . . . not to submit any evidence into the record . . . ." *Id.* at 40-41. Caris also claimed that the plaintiff had not raised this issue in his complaint.

The plaintiff actually had raised this issue in his complaint. *See* Dkt. 10 ¶ 116 ("Additionally, in exercising its repurchase right under the Plan, Defendant improperly withheld approximately eight percent (8%) of the price paid to repurchase the option holders' options."). And the plaintiff did not have to submit evidence into the record because the plaintiff obtained stipulations of fact in the pre-trial order that eliminated the need for proof.

Caris continued to object at the post-trial hearing. By this point, Caris had a different argument: Caris had adjusted the exercise price and issued more shares. As counsel explained, "so what you got, if you were an option holder, is you got a bunch of adjusted options, and you got more than you had before. So you got options with a lower strike price, but you got more of them. . . ." Dkt. 115 at 62. Counsel provided the following example:

So let's assume you have got a thousand of these $5 options. Okay. So what happened in the merger was that they took the ratio [of 1.1367] . . . and they used that in two ways. They multiplied your thousand options by that number. So now you had 1,137 options. They also took that and divided it into the exercise price to reduce your exercise price to $4.40. So now you have 1,137 options, with a strike price of $4.40, where before you had a thousand options with a strike price of 5.

* * *

> So now what you've done is now gotten the value that you should get, your 61 cents a share, the difference between 4.46 and 5.07. You've gotten that. But you didn't get it in cash from 5.07 a share; you have got it because you got more shares. You now have 1,137 options; whereas before you had 1,000. And that way the math works. The exercise price is now 4.40. You are covered because you got 4.46. You get your money; you are made whole.

*Id.* at 64.

In an effort to ensure that I understood the Company's position, I permitted Caris to supplement the record with additional exhibits and to make a supplemental submission. The supplemental submission confirmed that Caris had handled the options as described during post-trial argument. That reality was contrary to the stipulated facts, earlier verified responses to interrogatories, earlier answers to requests for admissions, and the description of the option payout that Caris send to option holders. What did *not* change was the fact that Caris had withheld a portion of the payment to fund the escrow.

The relationship between Caris and its option holders was governed by contract. The operative contract was not the Merger Agreement, but rather the Plan. *See Nemec v. Shrader*, 2009 WL 1204346, at *4 (Del. Ch. Apr. 30, 2009) ("Whether the directors possessed the right to redeem plaintiffs' shares and whether the directors properly exercised that right is simply a matter of contract interpretation."), *aff'd*, 991 A.2d 1120 (Del. 2010). Section 12.3 of the Plan gave the Board discretion as to whether to cancel the options in connection with the Merger, but if it did, then the option holders were entitled to receive "the difference between the Fair Market Value and the exercise price for all shares of Common Stock subject to exercise." The Plan did not permit an escrow

74

holdback. It required a payment of the difference between Fair Market Value and the exercise price.

The Merger Agreement did provide for an escrow holdback. As described in the Factual Background, the Option Conversion Provision purported to convert the options into the right to receive certain consideration, defined the consideration in terms of the Per Share Common Payment, and thereby incorporated the escrow provisions in the Merger Agreement. Section 251(b)(5) of the DGCL provides that a merger agreement shall state

> [t]he manner, if any, of converting the shares of each of the constituent corporations into shares or other securities of the corporation surviving or resulting from the merger or consolidation, or of cancelling some or all of such shares, and, if any shares of any of the constituent corporations are not to remain outstanding, to be converted solely into shares or other securities of the surviving or resulting corporation or to be cancelled, the cash, property, rights or securities of any other corporation or entity which the holders of such shares are to receive in exchange for, or upon conversion of such shares . . . .

8 *Del. C.* § 251(b)(5). Section 251(b) also provides that

> [a]ny of the terms of the agreement of merger or consolidation may be made dependent upon facts ascertainable outside of such agreement, provided that the manner in which such facts shall operate upon the terms of the agreement is clearly and expressly set forth in the agreement of merger or consolidation. The term "facts," as used in the preceding sentence, includes, but is not limited to, the occurrence of any event, including a determination or action by any person or body, including the corporation.

*Id.* § 251(b). By virtue of these provisions, a merger agreement can convert shares into the right to receive consideration that incorporates the outcome of an indemnification mechanism. *See Aveta Inc. v. Cavallieri*, 23 A.3d 157, 171-78 (Del. Ch. 2010). The

power to specify the package of consideration into which shares are converted and to make the consideration dependent upon facts outside the merger agreement enables deal planners to bind non-signatory stockholders to post-closing adjustments, including escrow arrangements, when those stockholders otherwise would not be bound under basic principles of contract and agency law. *See id.* at 169-71 (holding that principal stockholders who signed merger agreement were bound to its terms).

Options are not shares, and option holders are not stockholders. *See Harff v. Kerkorian*, 324 A.2d 215, 219 (Del. Ch. 1974), *aff'd in part, rev'd on other grounds*, 347 A.2d 133 (Del. 1975). Options are rights granted pursuant to Section 157 of the DGCL. The rights and obligations of the parties to the option are governed by the terms of their contract.[22] Section 251(b)(5) does not authorize the conversion of options in a merger. The Plan could have been drafted differently, such as by providing that holders of options cancelled in connection with the merger would receive the same consideration received by holders of stock, less the exercise price. The Plan did not say that. The Plan said that holders of cancelled options would receive the difference between the Fair Market Value of the underlying shares and the exercise price for their options.

Caris breached the Plan by deducting the escrow amount from the consideration it paid to holders of cancelled options. The Plan obligated Caris to pay them the full amount of the difference between Fair Market Value and the exercise price. Because of the

---

[22] *See AT&T Corp v. Lillis*, 953 A.2d 241, 252 (Del. 2008); *Gamble v. Penn. Valley Crude Oil Corp.*, 104 A.2d 257, 260-61 (Del. Ch. 1954) (Seitz, V.C.); *Kingston v. Home Life Ins. Of Am.*, 101 A. 898, 900 (Del. Ch. 1917).

remedy granted in this decision, this holding does not give rise to separate element of damages. As discussed in the next section, this decision awards the holders of cancelled options the difference between what the Board should have determined in good faith to be Fair Market Value and the amount the option holders received. Caris may decide to pay a portion of the judgment by delivering the escrowed portion of the option consideration to the option holders. Or Caris may pay the judgment separately, in which case the option holders would not be entitled to any amount from the escrow. Awarding the option holders damages plus permitting them to receive their share of the escrowed funds would result in a duplicative recovery.

## D.      Damages

"To satisfy the final element [of a breach of contract claim], a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract." *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *13 (Del. Ch. Sept. 30, 2013). "While courts will not award damages which require speculation as to the value of unknown future transactions, so long as the court has a basis for a responsible estimate of damages, and plaintiff has suffered some harm, mathematical certainty is not required." *Thorpe v. CERBCO, Inc.*, 19 Del. J. Corp. L. 942, 963 (Del. Ch. Oct. 29, 1993) (Allen, C.).

"[T]he standard remedy for breach of contract is based upon the reasonable expectations of the parties *ex ante*." *Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001). "It is a basic principle of contract law that remedy for a breach should seek to give the nonbreaching the party the benefit of its bargain by putting that party in the position it

would have been but for the breach." *Genencor Int'l, Inc. v. Novo Nordisk A/S*, 766 A.2d 8, 11 (Del. 2000). "Expectation damages thus require the breaching promisor to compensate the promisee for the promisee's reasonable expectation of the value of the breached contract, and, hence, what the promisee lost." *Duncan*, 775 A.2d at 1022. Here, the plaintiff alleges that the Administrator's arbitrary and capricious determination of fair market value undervalued the Caris options. The court must, therefore, "determine plaintiff's damages as if the parties had fully performed the contract." *Reserves Dev. LLC v. Crystal Props., LLC*, 986 A.2d 362, 367 (Del. 2009).

The question in this case is what the Board would have determined to be the Fair Market Value of a share of Caris common stock in connection with the Merger, if it had adjusted the options to take into account the Spinoff and made its determination in good faith. I have considered the evidence as a whole, including the experts' opinions and the various indications of value.

In my view, had the Board proceeded in good faith, it would have retained Grant Thornton to determine the fair market value of TargetNow and Carisome. Absent Martino's intervention, Grant Thornton would have prepared its report using methods and techniques that were consistent with its prior work. The Board then would have used the values of TargetNow and Carisome, in conjunction with the sale price for the AP business, to determine what option holders would have received.

The record contains the draft stock option valuation that Grant Thornton prepared in the ordinary course using figures that became the basis for the August 2011 projections. *See* JX 42. In that valuation, Grant Thornton derived values for the AP

business, TargetNow, and Carisome as of December 31, 2015, then discounted the figures back to the valuation date of March 31, 2011. For the damages calculation, I will discount the figures back to a valuation date of October 31, 2011, which is the same date PwC and Grant Thornton used. It provides a convenient end-of-the-month date between the approval of the Merger Agreement on October 5 and the closing of the Miraca Transaction on November 22. The following table depicts the calculations:

| | Base | Upside | Downside | GT Weighted Avg. | Discount Rate[23] | Value as of 10/31/2011 |
|---|---|---|---|---|---|---|
| AP Business | $815,862 | $1,140,479 | $585,833 | $897,016 | 15.3 | $495,654 |
| TargetNow | $93,027 | $114,589 | $72,290 | $98,418 | 19.1 | $47,509 |
| Carisome | $485,851 | $812,494 | $178,123 | $567,512 | 24.7 | $226,220 |

As the table shows, combining TargetNow and Carisome implies a value for SpinCo of $273,729,000. From the evidence presented at trial, this is a reasonable approximation of the Board's subjective belief at the time. My assessment of what the Board believed differs only in the relative weighting. I think that in fall 2011, the Board valued TargetNow more highly—closer to $150 million. That figure is at the low end of the $150 to $300 million that Martino estimated in April and below the $195 to 300 million that Citi estimated in May and suggested at other points in the process. It is towards the low end of the values in JH Whitney's internal documents, which referenced figures of $153.5 million (JX 161) and $187.2 million (JX 162).

---

[23] The discount factor is the weighted average cost of capital for each business, as calculated by Grant Thornton. *See* JX 42 at CDX177782.

My belief from the record is that the Board did not value Carisome as highly as the Grant Thornton figures imply. The success of Carisome was still too contingent and uncertain, and Carisome had experienced more significant setbacks than TargetNow. What the evidence instead suggests is that the Board believed Carisome, although riskier, was worth at least as much as TargetNow. The Board actually thought Carisome was likely worth more, but only if the lottery ticket paid off.

Based on this reasoning, were I to set aside the Grant Thornton stock option analysis, I would conclude from the balance of the record that the Board believed TargetNow and Carisome together were worth around $300 million. Grant Thornton's figure of $273 million is conservative relative to that assessment. It bears noting that Grant Thornton's work implied a value for the AP business on the valuation date of $456 million, roughly 63% of the price Miraca paid. This comparison suggests that when conducted in the ordinary course, Grant Thornton's valuation work was not overly aggressive.

Using documents from the record, the plaintiff's expert constructed a table that calculated the value per share generated in the Miraca Transaction. I have reproduced it below with two additional columns to reflect my adjustment to the value of SpinCo.

| Caris Fair Market Value | Merger Consideration | SpinCo Value | Total Caris Value | Adjusted SpinCo | Adjusted Caris |
|---|---|---|---|---|---|
| Miraca Transaction Price | 725,000 | | 725,000 | | 725,000 |
| FMV of TargetNow and Carisome | | 65,030 | 65,030 | 240,000 | 240,000 |
| Plus: Other Adjustments | | 3,326 | 3,326 | 3,326 | 3,326 |
| Less Outstanding Debt | (178,134) | | (178,134) | | (178,134) |
| Less Transaction Fee | (7,345) | | (7,345) | | (7,345) |
| Less Transaction Expense | (3,286) | | (3,286) | | (3,286) |
| Plus Option Exercise Cash | 22,496 | | 22,496 | | 22,496 |
| Plus Balance Sheet Cash | 29,667 | 2,720 | 32,387 | 2,720 | 32,387 |
| Less Working Capital Adj. | (1,702) | | (1,702) | | (1,702) |
| Implied Equity Value | 586,697 | 71,076 | 657,773 | 246,046 | 778,742 |
| Less Value of Preferred | (64,550) | | (64,550) | | (64,550) |
| FMV Common Shares | 522,146 | 71,076 | 593,222 | 246,046 | 714,192 |
| Total Common Shares (000) | 116,991 | 116,991 | 116,991 | 116,991 | 116,991 |
| Per Share FMV of Common Shares ($) | $4.46 | $0.61 | $5.07 | $2.10 | $6.57 |

The parties stipulated that options to purchase 9,663,026 shares were cancelled in connection with the Merger. The parties stipulated that the aggregate exercise price of the 9,663,026 options was $26,467,487 and that the option holders received proceeds of $20,713,012. This amount included the escrow deduction. Based on these figures, the Class is entitled to damages of $16,260,332.77.

| | |
|---|---|
| Cancelled Option Shares | 9,663,026 |
| FMV Per Share | $6.57 |
| Total FMV of Cancelled Option Shares | $63,499,831.77 |
| Less: Aggregate Exercise Price | $26,476,487.00 |
| Less: Proceeds Received | $20,713,012.00 |
| Damages Suffered By Class | $16,260,332.77 |

The plaintiff has sought additional damages based on the tax treatment that the option holders received. He observes that the proceeds from the cancellation of the options were taxed as ordinary income. Halbert and Fund VI received capital gains tax treatment for the combination of cash and stock that they received. The plaintiff observes

that Caris reached a special agreement with Knowles to make him whole for the additional tax he paid on his options so that he would receive the functional benefit of capital gains treatment. The tax treatment is a function of federal law. The option holders' proceeds would have been taxed as ordinary income even if Caris had fulfilled its obligations under the Plan. This is not an element of damages to which they are entitled.

## III.  CONCLUSION

The Class is awarded damages of $16,260,332.77. Pre- and post-judgment interest is due on this amount at the legal rate, compounded quarterly, from November 22, 2011, until the date of payment.

## EXHIBIT A

| Exhibit | JX 23 | JX 22 | JX 26 | JX 35 | JX 42 | JX 168 |
|---|---|---|---|---|---|---|
| Purpose | Options | Options | ASC 350 | Options | Options | Spinoff |
| Report Date | 2/11/11 | 2/11/11 | 4/5/11 | 5/24/11 | 7/13/11 | 11/10/11 |
| Valuation Date | 3/31/10 | 6/30/10 | 10/1/10 | 12/31/10 | 3/31/11 | 10/31/11 |
| Future Valuation Date | 12/31/13 | 12/31/14 | NA | 12/31/14 | 12/31/15 | NA |
| AP Business Base Case | $763,947 | $911,156 | NA | $761,326 | $815,862 | NA |
| AP Business Upside Case | $873,197 | $987,844 | NA | $999,450 | $1,140,479 | NA |
| AP Business Downside Case | $626,147 | $787,718 | NA | $519,756 | $585,833 | NA |
| AP Business Weighted Average | $791,260 | $930,328 | NA | $820,857 | $897,016 | NA |
| AP Business Discount Rate | 15.40% | 15.50% | 14.90% | 15.50% | 15.30% | NA |
| AP Business as of Valuation Date | $462,431 | $486,426 | $650,671 | $461,253 | $456,154 | $725,000 |
| AP Business as of 10/31/11 | $580,149 | $589,467 | NA | $520,105 | $495,654 | $725,000 |
| TargetNow Base Case | $167,154 | $135,533 | NA | $114,285 | $93,027 | NA |
| TargetNow Upside Case | $182,037 | $143,888 | NA | $136,305 | $114,589 | NA |
| TargetNow Downside Case | $148,830 | $126,429 | NA | $97,382 | $72,290 | NA |
| TargetNow Weighted Average | $170,875 | $137,622 | NA | $119,790 | $98,418 | NA |
| TargetNow Discount Rate | 19.20% | 19.30% | 18.70% | 19.30% | 19.10% | NA |
| TargetNow as of Valuation Date | $88,439 | $62,202 | $104,278 [2] | $59,137 | $42,903 | $37,122 |
| TargetNow as of 10/31/11 | $116,792 | $78,703 | NA | $68,506 | $47,509 | $37,122 |
| Carisome Base Case | $226,614 | $322,232 | NA | $343,267 | $485,851 | NA |
| Carisome Upside Case | $388,123 | $639,861 | NA | $617,162 | $812,494 | NA |
| Carisome Downside Case | $24,750 | $236,666 | NA | $103,639 | $178,123 | NA |

| | | | | | | |
|---|---|---|---|---|---|---|
| Carisome Weighted Average | $266,991 | $401,639 | | NA | $411,741 | $567,512 | NA |
| Carisome Discount Rate | 24.90% | 25.10% | | NA | 24.90% | 24.70% | NA |
| Carisome as of Valuation Date | $115,981 | $146,615 | | NA | $169,190 | $198,888 | $17,634 |
| Carisome as of 10/31/11 | $164,922 | $197,631 | | NA | $203,630 | $226,220 | $17,634 |

Notes:
1. All dollar figures are in 000s.
2. The ASC 350 report separately valued the TargetNow tradename at $2,767,000 and that database at $3,150,000. Those assets have been added to the TargetNow value. In addition, the report valued TargetNow's equity after allocating to TargetNow $12,271,000 of Caris's debt. The other reports value TargetNow as a debt-free enterprise, so the value of the debt has been added back to generate a similar enterprise value.
3. Present Value Periods used for discounting:

| | 3/31/2010 | 6/30/2010 | 12/31/2010 | 3/31/2011 | 10/31/2011 |
|---|---|---|---|---|---|
| 12/31/2013 | 3.75 | 3.5 | 3 | 2.75 | 2.16666667 |
| 12/31/2014 | 4.75 | 4.5 | 4 | 3.75 | 3.16666667 |
| 12/31/2015 | 5.75 | 5.5 | 5 | 4.75 | 4.16666667 |